U.S. DISTRICT COURT - N.D. OF N.Y.
**FILED**
OCT 2 4 2019
AT_____ O'CLOCK
John M. Domurad, Clerk - Albany

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.* [UNDER SEAL]; | ) | |
| NEW YORK STATE | ) | C.A. No. 1:19-cv-1311 |
| *ex rel.* [UNDER SEAL]; | ) | |
| | ) | |
| Plaintiffs, | ) | **RELATORS' COMPLAINT** (DNH/DJS) |
| | ) | |
| v. | ) | |
| | ) | FILED UNDER SEAL |
| [UNDER SEAL] | ) | FALSE CLAIMS ACT |
| Defendant | ) | 31 U.S.C. § 3730(b)(2) |
| | ) | |

FILED IN CAMERA AND UNDER SEAL

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *EX REL.* STACEY ROSENBERGER and KELLEY RETIG AS CO-RELATORS; §
§
§
§

STATE OF NEW YORK *EX REL.* STACEY ROSENBERGER and KELLEY RETIG AS CO-RELATORS, §
§
§
§

Plaintiffs, §
§

v. §
§

STRAUSS VENTURES, LLC D/B/A THE GRAND HEALTHCARE SYSTEM; CENTER FOR REHABILITATION AND HEALTHCARE AT DUTCHESS LLC D/B/A THE GRAND REHABILITATION AND NURSING AT PAWLING; CLEARVIEW OPERATING CO. LLC D/B/A THE GRAND REHABILITATION AND NURSING AT QUEENS; RIVER VALLEY OPERATING ASSOCIATES LLC D/B/A THE GRAND REHABILITATION AND NURSING AT RIVER VALLEY; GRAND GREAT NECK LLC D/B/A THE GRAND REHABILITATION AND NURSING AT GREAT NECK; GRAND SOUTH POINT LLC D/B/A THE GRAND REHABILITATION AND NURSING AT SOUTH POINT; BARNWELL OPERATIONS ASSOCIATES LLC D/B/A THE GRAND REHABILITATION AND NURSING AT BARNWELL; GUILDERLAND OPERATOR LLC D/B/A THE GRAND REHABILITATION AND NURSING AT GUILDERLAND; GRAND MOHAWK VALLEY LLC D/B/A THE GRAND §
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Civil Action No. _____

**RELATORS' COMPLAINT AND DEMAND FOR JURY TRIAL**

FILED IN CAMERA AND UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)

DO NOT ENTER INTO PACER
DO NOT ENTER IN CM/ECF
DO NOT PLACE IN PRESS BOX

REHABILITATION AND NURSING AT §
MOHAWK VALLEY; GRAND §
BATAVIA LLC D/B/A THE GRAND §
REHABILITATION AND NURSING AT §
BATAVIA; CHITTENANGO CENTER §
LLC D/B/A THE GRAND §
REHABILITATION AND NURSING AT §
CHITTENANGO; ROME CENTER §
LLC D/B/A THE GRAND §
REHABILITATION AND NURSING AT §
ROME; HERITAGE OPERATING §
ASSOCIATES, LLC D/B/A THE §
GRAND REHABILITATION AND §
NURSING AT UTICA, §
§
Defendants. §

## FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

Jeffrey A. Newman, Esq.
Massachusetts BBO # 370450
Jeffrey Newman Law
One Story Terrace
Marblehead, Ma. 01945
Tel: 617-823-3217
Fax: 781-639-8688
Jeffrey@jeffreynewmanlaw.com

Jonathan A. Willens
NDNY Bar No. 103405
Edward Scarvalone
Willens & Scarvalone LLP
One Liberty Plaza, Suite 2300
New York, NY 10006
Tel: (646) 200-6333
Fax: (800) 879-7938
jawillens@willensscarvalone.com

*Attorneys for Co-Relators*
*Stacey Rosenberger and Kelley Retig*

## I. PRELIMINARY STATEMENT

1. This is an action against Strauss Ventures, LLC d/b/a The Grand Healthcare System and the twelve (12) skilled nursing facilities ("Defendant SNFs") it controls and operates (collectively, "Defendants") to recover damages and civil penalties under the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and the New York False Claims Act, State Finance Law, Art. XIII § 187-194.

2. As more fully alleged herein, this action arises out of the Defendants' continuing schemes to defraud the United States of America and the State of New York through the submission of false and fraudulent claims for payment for therapy services to Medicare and the New York Medicaid program.

3. At all times since at least January 1, 2014, Defendants have submitted claims for reimbursement by Medicare and Medicaid that were false because they were for services that were unreasonable, unnecessary, unskilled or that simply did not occur as the Defendants reported them to have occurred.

4. Specifically, Defendants provided therapy services unrelated to the patients' individual medical needs and which were devised to obtain the highest levels of Medicare and Medicaid reimbursement.

5. Defendants billed for therapy services that were never provided. Defendants backdated and falsified records by adding therapy minutes that were never actually rendered so that the facility could meet its projected metrics and increase reimbursements.

6. Defendants placed nearly all new Medicare Part A patients initially in the highest therapy reimbursement level, Ultra High RUG, regardless of medical necessity. This is directly

contrary to Medicare regulations. This also forced patients to undergo therapy services they did not need and could not tolerate due to their poor health.

7. Defendants created lists of Medicare Part B and Medicaid patients who should be admitted to skilled therapy services in order to increase the facility's case mix score and reimbursement levels, and instructed therapists to admit those patients for therapy despite their clinical judgment. Defendants recycled patients into therapy for profit.

8. Defendants established and implemented a productivity quota of 90% and higher for physical and occupational therapists and therapy assistants. This quota forced the therapists and therapy assistants to invoice Medicare for time spent on writing patient reports and engaging in other non-billable tasks, such as transporting patients to the therapy room, in order to meet the productivity targets.

9. Defendants also billed Medicare for unskilled services, such as watching patients sleep or brushing patients' hair, in order to meet the targets set by company-wide policy for therapy minutes. These services are not reimbursable.

10. Defendants purposefully delayed patient discharges and continued skilled therapy services on patients who not only did not need the therapy but could not tolerate the therapy, had met their goals or reached a plateau in their progress. Although the therapists had recommended discharge, Defendants continued to offer medically unnecessary therapy for the sole purpose of increasing Medicare reimbursements.

11. Defendants inflated initial reimbursements by billing evaluation time as treatment time.

12. The schemes date back to at least January 1, 2014 and are ongoing.

## II.   JURISDICTION AND VENUE

13.   This action arises under the FCA, 31 U.S.C. § 3729 et seq. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331. Supplemental jurisdiction for Counts V through VIII arises under 28 U.S.C. § 1367 because these claims are so related to the federal claims that together they form part of the same case or controversy under Article III of the U.S. Constitution.

14.   At all times material to this Complaint, Defendants regularly conducted substantial business within the State of New York, maintained permanent employees and offices in New York, and made and are making significant revenue within New York.  Defendants are thus subject to personal jurisdiction in New York.

15.   Venue is proper in the Albany courthouse of this district pursuant to 31 U.S.C. § 3732(a) because the Defendants Barnwell Operations Associates LLC d/b/a The Grand Rehabilitation And Nursing At Barnwell is located in Valatie, Columbia County, and Guilderland Operator LLC d/b/a The Grand Rehabilitation And Nursing At Guilderland is located in Altamont, Albany County, both in the Northern District of New York.

## III.   FILING UNDER SEAL

16.   Under the FCA, this Complaint is to be filed in camera and remain under seal for a period of at least sixty days and shall not be served on Defendants until the Court so orders.

17.   As required by the FCA and relevant state statutes, Relators voluntarily submitted, prior to the filing of this Complaint, a confidential pre-filing disclosure statement (subject to the attorney-client, work product and common-interest privileges) to the governments of the United States and the State of New York on or about October 18, 2019 containing

FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **5** of **98**

materials, evidence, and information in their possession pertaining to the allegations contained in this Complaint.

## IV. PARTIES

18. The real parties in interest as Plaintiffs are the United States of America and the State of New York.

### A. Relator Stacey Rosenberger

19. Relator Stacey Rosenberger is a resident of the State of New York and a licensed Speech Language Pathologist ("SLP"). She worked for Defendant Center For Rehabilitation And Healthcare At Dutchess LLC in Pawling, New York as an SLP from April 2017 to April 2018. On or about April 19, 2018, Relator Rosenberger was terminated because she refused to participate in the fraudulent and illegal practices described herein.

20. Since April 2017, Relator Rosenberger has also worked as an SLP at Wingate Healthcare - Dutchess County. Before that, she worked as an SLP for E-Therapy-Telepractice from September 2016 to March 2017, for Pediatric Potentials Therapy from August to December 2016, for Adults to Pediatric Therapy from February 2016 to August 2016, and for Speech Rehab Services, LLC from September 2015 to June 2016.

21. She obtained her Master's Degree in Speech Language Pathology from Nova Southeastern University in August 2015.

### B. Relator Kelley Retig

22. Relator Kelley Retig (formerly Kelley Rosenberger) is a resident of the State of New York and a Certified Occupational Therapy Assistant ("COTA"). She is the sister of Relator Rosenberger. Relator Retig started working for Defendant Center For Rehabilitation And Healthcare At Dutchess LLC in October 2016 as a PRN (per diem/as needed) COTA.

23. Since February 2016 she has also worked as a home care COTA at Western CT Health Network and since December 2015 she has worked as a PRN COTA at Waterview Hills. From March 2016 to June 2018, she worked as a PRN COTA for Wingate at Beacon; from January to October 2016, she worked as a pediatric COTA for Milestones For Munchkins; from May 2014 to February 2016, she worked as a COTA at Genesis Rehab Services and as a per-diem COTA at Sprainbrook Manor Rehabilitation.

**C. Defendant Strauss Ventures, LLC d/b/a The Grand Healthcare System**

24. Defendant Strauss Ventures, LLC d/b/a The Grand Healthcare System ("The Grand") is a New York corporation. According to documents filed with the New York State Department of Health,[1] the company was formed to hold Jeremy and Meryl Strauss' ownership interest in healthcare related entities. It is 100% owed by Jeremy and Meryl Strauss. Its corporate address is their home at 256 Maple Street, West Hempstead, NY 11552.

25. According to The Grand's website, The Grand is headquartered at 1720 Whitestone Expy., Suite 500, Whitestone, NY.

26. The Grand controls and operates the twelve Defendant SNFs listed herein, and also provides operational consulting to the following four facilities:

    a. Chestnut Park Rehabilitation and Nursing located at 330 Chestnut Street, Oneonta, NY

    b. Robinson Terrace Rehabilitation and Nursing Center located at 28652 State Highway 23, Stamford, NY.

---

[1] https://www.health.ny.gov/facilities/public_health_and_health_planning_council/meetings/2016-03-31/docs/exhibits.pdf;
https://www.health.ny.gov/facilities/public_health_and_health_planning_council/meetings/2018-05-17/docs/agenda.pdf;
https://www.health.ny.gov/facilities/public_health_and_health_planning_council/meetings/2018-09-27/docs/exhibits.pdf;

c. Colonial Park Rehabilitation and Nursing Center located at 950 Floyd Ave, Rome, NY.

d. Buffalo Community Healthcare Center located at 1205 Delaware Ave, Buffalo, NY.

27. Jeremy Strauss is the Chief Executive Officer ("CEO") of The Grand; Joe Yurowitz is Senior Vice President; Bruce Gendron, Daniel Muskin, Elizabeth Buddle, and Candace J. Spencer are Regional Vice Presidents; Avi Kahn is Corporate Director of facilities Management; and Jonathan Strauss was listed as Executive Vice President on The Grand's website until 2018. Eric Rogers is the Chief Financial Officer ("CFO") of The Grand.[2] Kathleen ("Katy") O'Conner was the Chief Reimbursement Officer of The Grand until on or about May 2019.[3]

28. Jonathan Strauss and Katy O'Conner are listed on the Pawling employee list.

**D. Defendant Center For Rehabilitation And Healthcare At Dutchess LLC d/b/a The Grand Rehabilitation And Nursing At Pawling**

29. Defendant Center For Rehabilitation And Healthcare At Dutchess LLC d/b/a The Grand Rehabilitation and Nursing at Pawling ("Pawling") is a corporation with its principal place of business in the State of New York. It is a skilled nursing facility located at 9 Reservoir Road, Pawling, NY.

30. According to CMS documents, Jeremy Strauss is majority owner of the facility. Eric Rogers, The Grand's CFO, operates and manages the facility and is listed as an Officer.

---

[2] According to his LinkedIn account, Mr. Rogers "facilitated company's rapid growth from six to 17 homes (828 to 2,7000 total beds), in less than two years." He also lead negotiations "resulting in 11 mergers from 2017 to present; currently in process of negotiating six additional mergers."
[3] This is according to her LinkedIn account. Relator Retig learned that she stopped working for The Grand the same week that Yosef Spierer left his employment as Administrator of Center For Rehabilitation And Healthcare At Dutchess LLC.

Jonathan Strauss, The Grand's Executive Vice President, is also listed as an Officer and managing employee.

31. Divya Siddam, Physical Therapist, is the Director of Rehab. Jonathan Halon is the facility's Administrator. Yosef Spierer was the facility's Administrator until May 2019. Christine Brett is the MDS coordinator.

### E. Defendant Clearview Operating Co. LLC d/b/a The Grand Rehabilitation And Nursing At Queens

32. Defendant Clearview Operating Co. LLC d/b/a The Grand Rehabilitation And Nursing at Queens ("Queens") is a corporation organized under the laws of the State of New York. It is a skilled nursing facility located at 157-15 19th Avenue, Whitestone.

33. According to CMS documents, Jeremy Strauss is majority owner of the facility, and operates and manages the facility. Eric Rogers, The Grand's CFO, also operates and manages the facility, and is listed as an Officer. Jonathan Strauss, The Grand's Executive Vice President, is also listed as an Officer. Daniel Muskin, Regional Vice President at The Grand, is listed as a managing employee.

34. Mila Levy, Occupational Therapist, is the Director of Rehab. Peretz Stein is the facility's administrator. Michael Hurtes is the Acting Administrator.

### F. Defendant River Valley Operating Associates LLC d/b/a The Grand Rehabilitation And Nursing At River Valley

35. Defendant River Valley Operating Associates LLC d/b/a The Grand Rehabilitation And Nursing at River Valley ("River Valley") is a corporation organized under the laws of the State of New York. It is a skilled nursing facility located at 140 Main Street, Poughkeepsie, NY.

36. According to CMS documents, Jeremy Strauss is majority owner of the facility, and operates and manages the facility. Eric Rogers, The Grand's CFO, and Jonathan Strauss, The Grand's Executive Vice President, also operate and manage the facility, and are listed as Officers.

37. Valerie Tucci, Occupational Therapist, is the Director of Rehab. Mark Groundland is the facility's Administrator.

### G. Defendant Grand Great Neck LLC d/b/a The Grand Rehabilitation And Nursing At Great Neck

38. Defendant Grand Great Neck LLC d/b/a The Grand Rehabilitation And Nursing at Great Neck ("Great Neck") is a corporation organized under the laws of the State of New York. It is a skilled nursing facility located at 15 St. Paul's Place, Great Neck, NY. The Grand acquired the facility in 2019.

39. According to CMS documents, Jeremy Strauss is majority owner of the facility, and operates and manages the facility. Meryl Strauss is a minority owner. Eric Rogers, The Grand's CFO, and Jonathan Strauss, The Grand's Executive Vice President, also operate and manage the facility, and are listed as Officers.

### H. Defendant Grand South Point LLC d/b/a The Grand Rehabilitation And Nursing At South Point

40. Defendant Grand South Point LLC d/b/a The Grand Rehabilitation And Nursing at South Point ("South Point") is a corporation organized under the laws of the State of New York. It is a skilled nursing facility located at 1 Long Beach Rd., Island Park, NY.

41. Mayer Spilman is the facility's Administrator.

**I. Defendant Barnwell Operations Associates LLC d/b/a The Grand Rehabilitation And Nursing At Barnwell**

42. Defendant Barnwell Operations Associates LLC d/b/a The Grand Rehabilitation And Nursing at Barnwell ("Barnwell") is a corporation organized under the laws of the State of New York. It is a skilled nursing facility located at 3230 Church Street, Valatie, NY. The Grand acquired the facility in December 2017.

43. According to CMS documents, Barnwell Acquisitions, LLC is a majority owner and Jeremy Strauss is an indirect owner of the facility. Eric Rogers, The Grand's CFO, and Jonathan Strauss, The Grand's Executive Vice President, operate and manage the facility, and are listed as Officers.

44. Bel Tan is the Director of Rehab. Akiva Shapiro is the facility's Administrator.

**J. Defendant Guilderland Operator LLC d/b/a The Grand Rehabilitation And Nursing At Guilderland**

45. Defendant Guilderland Operator LLC d/b/a The Grand Rehabilitation And Nursing at Guilderland ("Guilderland") is a corporation organized under the laws of the State of New York. It is a skilled nursing facility located at 428 NYS Highway 146, Altamont, NY. The Grand acquired the facility in November 2016.

46. According to CMS documents, Strauss Ventures, LLC is a majority owner and Jeremy Strauss is an indirect owner of the facility. Eric Rogers, The Grand's CFO, and Jonathan Strauss, The Grand's Executive Vice President, operate and manage the facility, and are listed as Officers.

47. Moshe Green is the facility's Administrator.

**K. Defendant Grand Mohawk Valley LLC d/b/a The Grand Rehabilitation And Nursing At Mohawk Valley**

48. Defendant Grand Mohawk Valley LLC d/b/a The Grand Rehabilitation And Nursing at Mohawk Valley ("Mohawk Valley") is a corporation organized under the laws of the State of New York. It is a skilled nursing facility located at 99 Sixth Avenue, Ilion, NY. The Grand acquired the facility in August 2018.

49. According to CMS documents, Jeremy Strauss is majority owner and Meryl Strauss is a minority owner of the facility. Eric Rogers, The Grand's CFO, and Jonathan Strauss, The Grand's Executive Vice President, also operate and manage the facility, and are listed as Officers.

50. Mark Smith is the facility's Administrator.

**L. Defendant Grand Batavia LLC d/b/a The Grand Rehabilitation And Nursing At Batavia**

51. Defendant Grand Batavia LLC d/b/a The Grand Rehabilitation And Nursing at Batavia ("Batavia") is a corporation organized under the laws of the State of New York. It is a skilled nursing facility located at 257 State Street, Batavia, NY. The Grand acquired the facility in August 2018.

52. According to CMS documents, Jeremy Strauss is majority owner of the facility, and operates and manages the facility. Meryl Strauss is a minority owner. Eric Rogers, The Grand's CFO, also operates and manages the facility and is listed as an Officer.

**M. Defendant Chittenango Center LLC d/b/a The Grand Rehabilitation And Nursing At Chittenango**

53. Defendant Chittenango Center LLC d/b/a The Grand Rehabilitation And Nursing at Chittenango ("Chittenango") is a corporation organized under the laws of the State of New

York. It is a skilled nursing facility located at 331 Russell Street, Chittenango, NY.

54. According to CMS documents, Jeremy Strauss is majority owner and Director of the facility. Eric Rogers, The Grand's CFO, and Jonathan Strauss, The Grand's Executive Vice President, operate and manage the facility, and are listed as Officers.

55. Amanda Infusino, Occupational Therapist, is the facility's Director of Rehab. Fred Deck is the Administrator. Tom Vondell is the Acting Administrator.

## N. Defendant Rome Center LLC d/b/a The Grand Rehabilitation And Nursing At Rome

56. Defendant Rome Center LLC d/b/a The Grand Rehabilitation And Nursing at Rome ("Rome") is a corporation organized under the laws of the State of New York. It is a skilled nursing facility located at 801 N. James Street, Rome, NY.

57. According to CMS documents, Jeremy Strauss is majority owner and Director of the facility. Eric Rogers, The Grand's CFO, and Jonathan Strauss, The Grand's Executive Vice President, operate and manage the facility, and are listed as Officers.

58. Stephanie Calicchia is the Director of Rehab. Kristen Spohr-Fulmer is the facility's Administrator.

## O. Defendant Heritage Operating Associates, LLC d/b/a The Grand Rehabilitation And Nursing At Utica

59. Defendant Heritage Operating Associates, LLC d/b/a The Grand Rehabilitation and Nursing at Utica ("Utica") is a corporation with its principal place of business in the State of New York. It is a skilled nursing facility located at 1657 Sunset Ave., Utica, NY.

60. The Grand acquired the Utica facility in March 2019, but had been managing it since 2017. In an interview for WOBX 950 AM, Jeremy Strauss stated: "Since 2017, while serving as consultants to Heritage, we focused our energies on managing the building and

bringing all levels of care up to par… Now this facility is officially under our ownership, we

look forward to launching this property according to the expectations of our brand."

## V. RELEVANT LAW

### A. The False Claims Act

#### i. *Federal False Claims Act*

61. The False Claims Act provides, in pertinent part, that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]…
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1).

62. A person who violations the FCA is liable to the United States Government for a

civil penalty of not less than $11,181 and not more than $22,363, plus three times the amount of

damages which the Government sustains because of the act of that person. *Id.*[4]

63. For purposes of the False Claims Act,

> (1) the terms "knowing" and "knowingly"

---

[4] Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by Section 701 of the Bipartisan Budget Act of 2015, Public Law 114-74 (Nov. 2, 2015) ("BBA"), 28 U.S.C. 2461 note, and 28 CFR § 85.5, the False Claims Act civil penalties were adjusted to $11,181 - $22,363 for penalties assessed after January 29, 2018, with respect to violations occurring after November 2, 2015; and effective March 1, 2019, the reverse false claims act penalties (under 31 U.S.C. 3729(a)(1)(G)) were again adjusted from a minimum of $11,181 to $11,463 and from a maximum of $22,363 to $22,927. *See* 15 CFR 6.

(A)     mean that a person, with respect to information – (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and

(B)     require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

### ii.     *New York False Claims Act*

64.     The New York False Claims Act provides liability for any person who:

a.  knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;
b.  knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;…
g.  knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; or
h.  knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same.

N.Y. Fin. Law § 189(1).

65.     Violators shall be liable to the state or a local government, as applicable, for a civil penalty from $6,000 to $12,000, plus three times the amount of all damages. N.Y. Fin. Law § 189(1).

66.     For purposes of the New York False Claims Act, "knowing and knowingly"

a.  mean that a person, with respect to information:

i.    has actual knowledge of the information;
ii.   acts in deliberate ignorance of the truth or falsity of the information; or
iii.  acts in reckless disregard of the truth or falsity of the information; and

b. require no proof of specific intent to defraud, provided, however that acts occurring by mistake or as a result of mere negligence are not covered by this article.

N.Y. Fin. Law § 188(3).

## B. The Medicare Program

### i. *Basic Medicare Coverage Requirements*

67.     Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426, 426A.

68.     The Medicare program is divided into four "parts" that cover different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

69.     Subject to certain conditions, Medicare Part A covers up to 100 days of care in a skilled nursing facility ("SNF") for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c).

70.     Among the conditions that Medicare imposes on its Part A SNF benefit are that: (1) the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a skilled nursing facility (for a condition treated during the hospital stay). 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

71.     Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the SNF and re-certify the patient's continuing need for skilled rehabilitation therapy services at regular intervals thereafter. *See* 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

72.     To be considered "skilled," a service must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists. *See* 42 C.F.R. § 409.31(a).

73.     Physical and Occupational Therapy Assistants "may not provide evaluative or assessment services, make clinical judgments or decisions; develop, manage, or furnish skilled maintenance program services; or take responsibility for the service. They act at the direction and under the supervision of the treating … therapist and in accordance with state laws." Medicare Benefit Policy Manual, Chapter 15, § 230.1.C and 230.2.C.

74.     Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitious exercises (*e.g.*, exercises to improve gait, maintain strength or endurance, or assistive walking). *See* 42 C.F.R. § 409.33(d). "Many skilled nursing facility inpatients do not require skilled physical therapy services but do require services, which are routine in nature. Those services can be performed by supportive personnel; e.g. aides or nursing personnel . . . ." Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1.

75.     Medicare Part A covers only those services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." *See* 42 U.S.C. § 1395y(a)(1)(A). In the context

of skilled rehabilitation therapy, this means that the services furnished must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; must be consistent with accepted standards of medical practice; and must be reasonable in terms of duration and quantity.[5] *See* Medicare Benefit Policy Manual, Ch. 8, § 30.

76.     In order to make it possible to assess whether services are reasonable and necessary, and therefore eligible for reimbursement, Medicare rules require proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that:

> no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.

42 U.S.C. § 1395g(a).

77.     In order to obtain reimbursement from Medicare, each SNF must submit a Medicare Enrollment Application in which the SNF certifies, among other things, that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare. *See* CMS Form 855A.

Violation of this statement is significant and not minimal or insubstantial. It also goes to the essence of the bargain for Medicare payment and is material to the Government's payment of claims pursuant to section 3729(b)(4) of the False Claims Act.

---

[5] Medicare patients also have a right to refuse treatment. Medicare.gov, *Skilled nursing facility rights*, https://www.medicare.gov/what-medicare-covers/part-a/rights-in-snf.html

### ii. *Medicare Reimbursement for SNF Care*

78.     Under its prospective payment system ("PPS"), Medicare pays a SNF a daily rate for each day of skilled nursing and rehabilitation services provided to a patient. *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998). The rate is based, in part, on the patient's anticipated "need for skilled nursing care and therapy." *Final Rule for Medicare Program's Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities*, 64 Fed. Reg. 41,644 (July 30, 1999). Specifically, the daily PPS rate that Medicare pays a SNF depends on the Resource Utilization Group ("RUG") to which a patient is assigned, and each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs. There are five general rehabilitation RUG levels for those beneficiaries that require rehabilitation therapy: Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

79.     The rehabilitation RUG level to which a patient is assigned depends upon the number of skilled therapy minutes and the number of therapy disciplines the patient received during a seven-day assessment reference period (also known as the "look back period"). The chart below reflects the requirements for the five general rehabilitation RUG levels and the corresponding daily reimbursement ranges during federal fiscal year 2018:

| Rehabilitation RUG Level | Requirements to Attain RUG Level | Daily Reimbursement Range[6] |
|---|---|---|
| Ultra High (RU) | at least 720 minutes per week total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least 5 days per week | $515.49 – $813.20 |
| Very High (RV) | Between 500 and 719 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week | $456.22 – $723.81 |
| High (RH) | Between 325 and 499 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week | $365.16 – $655.79 |
| Medium (RM) | Between 150 and 324 minutes per week total therapy; therapy must be provided at least 5 days per week but can be any mix of disciplines | $312.71 – $601.56 |
| Low (RL) | minimum 45 minutes per week total therapy; therapy must be provided at least 3 days per week but can be any mix of disciplines | $253.63 – $528.3 |

82 Fed. Reg. 191, 46163-46170 (October 4, 2017)

80. The Ultra High RUG level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. 26,252, 26,258 (May 12, 1998). In announcing the final PPS rule for SNFs, the Centers for Medicare and Medicaid Services ("CMS") further explained that the RUG system "uses minimum levels of minutes per week as qualifiers . . . These minutes are minimums and are not to be used as upper limits for service provision . . . Any policy of holding therapy to the bare minimum, regardless of beneficiary need, is inconsistent with the statutory requirements . . . and

---

[6] These rates were for SNFs in urban areas. The specific reimbursement amount within each range depended on additional factors, including the patient's ability to perform certain activities of daily living such as eating and toileting, and the patient's need for extensive services such as intravenous treatment, or ventilator or tracheostomy care.

will result in poor outcomes, longer lengths of stay, and a degradation in the facility's quality of care." 64 Fed. Reg. 41,644, 41,662 (July 30, 1999).

81.    A nursing facility must determine each patient's RUG as of specific "assessment reference dates" ("ARDs"), and the RUG as of the ARD then determines the daily reimbursement rate prospectively for a specific timeframe.  As of 2011, the Medicare assessment schedule was as follows:

| RUG Assessment Type | Assessment Reference Date Window (including grace days) | Medicare Payment Days Determined by RUG |
|---|---|---|
| 5 day | Days 1-8 | Days 1-14 |
| 14 day | Days 11-19 | Days 15-30 |
| 30 day | Days 21-34 | Days 31-60 |
| 60 day | Days 50-64 | Days 61-90 |
| 90 day | Days 80-94 | Days 91-100 |

76  Fed. Reg. 88, pages 26364, 26389 (May 6, 2011)

82.    SNFs report therapy treatment times for each assessment reference period on a Minimum Data Set ("MDS") form that is completed as of each ARD in a patient's stay.  *See* 64 Fed. Reg. at 41,661; 42 C.F.R. § 413.343.  Prior to October 1, 2010, a SNF would electronically transmit the MDS form to a state's health department or other appropriate agency, which in turn would transmit the data to CMS.  42 C.F.R. § 483.20(f)(3) (2008); 42 C.F.R. § 483.315(h)(1)(v) (2008).  Since October 1, 2010, SNFs transmit the data directly to CMS.  42 C.F.R. § 483.20(f)(3).  Completion of the MDS is a prerequisite to payment under Medicare.  *See* 63 Fed. Reg. at 26,265.  The MDS form requires a certification by the provider stating, in part: "To the best of my knowledge, this information was collected in accordance with applicable Medicare

FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **21** of **98**

and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds." MDS Versions 2.0 and 3.0 for Nursing Home Resident Assessment and Care Screening. A patient's RUG information is also incorporated into the Health Insurance Prospective Payment System ("HIPPS") code, which Medicare uses to determine the payment amount owed to the nursing facility. The HIPPS code must be included on the CMS-1450 form, which SNFs submit monthly to Medicare via intermediaries known as Medicare Administrative Contractors that process and pay Medicare claims. Medicare Claims Processing Manual, Ch. 25, § 75.5.

83.     Prior to the commencement of therapy in any discipline, a therapist certified in that discipline must evaluate the patient and develop a treatment plan that is approved by a physician. *See* 64 Fed. Reg. at 41,660-61; 42 C.F.R. §§ 409.17, 409.23.

84.     The therapy time reporting rules make clear that "[t]he time it takes to perform the formal initial evaluation and develop the treatment goals and the plan of treatment may not be counted as minutes of therapy received by the beneficiary." 64 Fed. Reg. at 41,661; *see also* RAI Manual, Ch. 3 at O-19 (Oct. 2014) ("The therapist's time spent on documentation or on initial evaluation is not included."). HHS has explained that "[t]his policy was established because we do not wish to provide an incentive for facilities to perform initial evaluations for therapy services for patients who have no need of those specialized services." 64 Fed. Reg. at 41,661. The purpose, however, is not to deprive providers of compensation for performing initial evaluations, because "the cost of the initial assessment is included in the payment rates for all Medicare beneficiaries in covered Part A SNF stays." *Id.* at 41661-62.

85.     Concurrent therapy is the treatment of two residents at the same time who are not performing the same or similar activities. *See* 74 Fed. Reg. at 40,315. Until October 1, 2010, if

a therapist provided 60 minutes of concurrent therapy to two beneficiaries at the same time, a SNF could attribute 60 minutes to each patient when determining each patient's RUG level. Effective October 1, 2010, CMS began requiring SNFs to divide the amount of time spent administering concurrent therapy between the two beneficiaries serviced; thus, if 60 minutes of concurrent therapy were provided, the SNF could attribute only 30 minutes to each beneficiary. *Id.* at 40,318-19.

86. In group therapy, a single therapist conducts the same or similar therapy exercises with two to four beneficiaries at the same time. *See* 76 Fed. Reg. 48,486, 48,516 (Aug. 8, 2011) (clarifying that, after October 1, 2011, group therapy must be planned for four patients). Group therapy should be initiated only after determining that the patient can benefit from therapy provided in a group setting and that the group therapy provided is necessary and appropriate for the patient. 76 Fed. Reg. at 48,514. "Therapists should document how the prescribed type and amount of group therapy will meet the patient's needs and assist the patient in reaching the documented goals." *Id.*

87. Until October 1, 2011, the therapy time-reporting rules contemplated that, if a therapist were to provide treatment to a group of up to four beneficiaries, "then it is appropriate to report the full time as therapy for each patient . . . [so long as] no more than 25 percent of the minutes reported in the MDS [for each therapy discipline] may be provided in a group setting." 64 Fed. Reg. 41,644, 41,662. Thus, for example, if a physical therapist conducted a 60-minute treatment session with four patients, the relevant MDS form for each of those patients could reflect the 60-minute treatment session. If, however, the MDS form for a particular patient reported a total of 200 minutes of physical therapy during the assessment reference period, then the SNF could not count more than 50 minutes (*i.e.*, 25 percent of 200) of group therapy toward

that total. To the extent the patient had received more than 50 minutes of group therapy during the assessment reference period, those additional minutes could not be reflected on the MDS form. Effective October 1, 2011, the group therapy time-reporting rules changed: under the new rules, group therapy must be intended for four patients, and the relevant MDS form for each of those patients should reflect one-fourth of the total time spent by the therapist in the group session. *See* 76 Fed. Reg. at 48,513-14.

88. Effective October 1, 2011, the Medicare rules further imposed a requirement that SNFs report a so-called Change of Therapy ("COT") if, after an assessment for a particular patient, "the intensity of therapy (that is, the total reimbursable therapy minutes . . .) changes to such a degree that it . . . no longer reflect[s] the RUG[] classification and payment assigned" for that patient. 76 Fed. Reg. at 48,518. Specifically, at the end of each 7-day period after an assessment, if the therapy delivered during that period does not match the last reported RUG, then the SNF must report the actual level of therapy being delivered in a COT, and the reimbursement for that patient's care will be adjusted accordingly. *See id.* at 48,518-26. For practical purposes, this change turned every week into a new look back period.

### *iii. The ADL Index*

89. Some residents require total assistance with their activities of daily living (ADLs) and have complex nursing care needs. Other residents may require less assistance with ADLs but may require rehabilitation or restorative nursing services. The Case Mix Reimbursement System measures the intensity of care and services required for each resident, and translates these measures into the amount of reimbursement given to the facility for care of a resident. Payment is linked to the intensity of resource use. Residents with heavy care needs require more staff resources and payment levels should be higher than for those residents with less intensive

care needs. In a case mix adjusted payment system, the amount of reimbursement to the nursing home is based on the resource intensity of the resident as measured by items on the MDS. *See* Long-Term Care Facility Resident Assessment Instrument (RAI) 3.0 User's Manual Version 1.16 October 2018.

90. The MDS assessment data is used to calculate the RUG-III Classification necessary for payment. The MDS contains extensive information on the resident's nursing needs, ADL impairments, cognitive status, behavioral problems, and medical diagnoses. This information is used to define RUG-III groups that form a hierarchy from the greatest to the least resources used. Residents with more specialized nursing requirements, licensed therapies, greater ADL dependency or other conditions will be assigned to higher groups in the RUG-III hierarchy. The Case Mix Index (CMI) is the weight or numeric score assigned to each RUG-III classification that reflects the relative resources predicted to provide care to a resident. Providing care to these residents is more costly, and is reimbursed on a higher level. *Id.*

91. The ADL score is used in all determinations of a resident's placement in a RUG-III category. It looks at four personal care tasks: transfer, bed mobility, toileting and eating. Each component ADL is scored by using both the "Self Performance" and "Support Provided."

# G0110: Activities of Daily Living (ADL) Assistance

**G0110. Activities of Daily Living (ADL) Assistance**
Refer to the ADL flow chart in the RAI manual to facilitate accurate coding

**Instructions for Rule of 3**
- When an activity occurs three times at any one given level, code that level.
- When an activity occurs three times at multiple levels, code the most dependent, exceptions are total dependence (4, activity must require full assist every time, and activity did not occur (8), activity must not have occurred at all. Example, three times extensive assistance (3) and three times limited assistance (2), code extensive assistance (3).
- When an activity occurs at various levels, but not three times at any given level, apply the following:
  o When there is a combination of full staff performance and extensive assistance, code extensive assistance.
  o When there is a combination of full staff performance, weight bearing assistance and/or non-weight bearing assistance code limited assistance (2).

**If none of the above are met, code supervision.**

**1. ADL Self-Performance**
Code for resident's performance over all shifts - not including setup. If the ADL activity occurred 3 or more times at various levels of assistance, code the most dependent - except for total dependence, which requires full staff performance every time

Coding:
  *Activity Occurred 3 or More Times*
  0. **Independent** - no help or staff oversight at any time
  1. **Supervision** - oversight, encouragement or cueing
  2. **Limited assistance** - resident highly involved in activity; staff provide guided maneuvering of limbs or other non-weight-bearing assistance
  3. **Extensive assistance** - resident involved in activity, staff provide weight-bearing support
  4. **Total dependence** - full staff performance every time during entire 7-day period
  *Activity Occurred 2 or Fewer Times*
  7. **Activity occurred only once or twice** - activity did occur but only once or twice
  8. **Activity did not occur** - activity did not occur or family and/or non-facility staff provided care 100% of the time for that activity over the entire 7-day period

**2. ADL Support Provided**
Code for most support provided over all shifts; code regardless of resident's self-performance classification

Coding:
  0. **No setup or physical help from staff**
  1. **Setup help only**
  2. **One person physical assist**
  3. **Two+ persons physical assist**
  8. **ADL activity itself did not occur** or family and/or non-facility staff provided care 100% of the time for that activity over the entire 7-day period

| | 1. Self-Performance | 2. Support |
|---|---|---|
| | ↓ Enter Codes in Boxes ↓ | |
| A. **Bed mobility** - how resident moves to and from lying position, turns side to side, and positions body while in bed or alternate sleep furniture | ☐ | ☐ |
| B. **Transfer** - how resident moves between surfaces including to or from bed, chair, wheelchair, standing position (excludes to/from bath/toilet) | ☐ | ☐ |
| C. **Walk in room** - how resident walks between locations in his/her room | ☐ | ☐ |
| D. **Walk in corridor** - how resident walks in corridor on unit | ☐ | ☐ |
| E. **Locomotion on unit** - how resident moves between locations in his/her room and adjacent corridor on same floor. If in wheelchair, self-sufficiency once in chair | ☐ | ☐ |
| F. **Locomotion off unit** - how resident moves to and returns from off-unit locations (e.g., areas set aside for dining, activities or treatments). If facility has only one floor, how resident moves to and from distant areas on the floor. If in wheelchair, self-sufficiency once in chair | ☐ | ☐ |
| G. **Dressing** - how resident puts on, fastens and takes off all items of clothing, including donning/removing a prosthesis or TED hose. Dressing includes putting on and changing pajamas and housedresses | ☐ | ☐ |
| H. **Eating** - how resident eats and drinks, regardless of skill. Do not include eating/drinking during medication pass. Includes intake of nourishment by other means (e.g., tube feeding, total parenteral nutrition, IV fluids administered for nutrition or hydration) | ☐ | ☐ |
| I. **Toilet use** - how resident uses the toilet room, commode, bedpan, or urinal; transfers on/off toilet; cleanses self after elimination; changes pad; manages ostomy or catheter; and adjusts clothes. Do not include emptying of bedpan, urinal, bedside commode, catheter bag or ostomy bag | ☐ | ☐ |
| J. **Personal hygiene** - how resident maintains personal hygiene, including combing hair, brushing teeth, shaving, applying makeup, washing/drying face and hands (excludes baths and showers) | ☐ | ☐ |

CMS's RAI 3.0 Manual, CH 3 MDS Items [G], October 2018

92.    Based on how the patient performs, each individual component ADL Index score ranges from 0 (independent) to 4 (total dependence). The following instructions must be followed when filling out Column 1 "Self-Performance."

- Code 0, independent: if resident completed activity with no help or oversight every time during the 7-day look-back period and the activity occurred at least three times.

- Code 1, supervision: if oversight, encouragement, or cueing was provided three or more times during the last 7 days.
- Code 2, limited assistance: if resident was highly involved in activity and received physical help in guided maneuvering of limb(s) or other non-weight-bearing assistance on three or more times during the last 7 days.
- Code 3, extensive assistance: if resident performed part of the activity over the last 7 days and help of the following type(s) was provided three or more times:
    - Weight-bearing support provided three or more times, OR
    - Full staff performance of activity three or more times during part but not all of the last 7 days.
- Code 4, total dependence: if there was full staff performance of an activity with no participation by resident for any aspect of the ADL activity and the activity occurred three or more times. The resident must be unwilling or unable to perform any part of the activity over the entire 7-day look-back period.
- Code 7, activity occurred only once or twice: if the activity occurred fewer than three times.
- Code 8, activity did not occur: if the activity did not occur or family and/or nonfacility staff provided care 100% of the time for that activity over the entire 7-day lookback period.

93.     The following instructions must be followed when filling in Column 2 "ADL Support." It is necessary to code for the most support provided over all shifts and to code regardless of how Column 1 "ADL Self Performance" is coded.

- Code 0, no setup or physical help from staff: if resident completed activity with no help or oversight.
- Code 1, setup help only: if resident is provided with materials or devices necessary to perform the ADL independently. This can include giving or holding out an item that the resident takes from the caregiver.
- Code 2, one person physical assist: if the resident was assisted by one staff person.
- Code 3, two+ person physical assist: if the resident was assisted by two or more staff persons.
- Code 8, ADL activity itself did not occur during the entire period: if the activity did not occur or family and/or non-facility staff provided care 100% of the time for that activity over the entire 7-day period.

*See* RAI 3.0 Manual, Version 1.16, October 2018.

94.     The ADL Score is calculated using the following steps.

**STEP # 1**

To calculate the ADL score use the following chart for bed mobility (G0110A), transfer (G0110B), and toilet use (G01101). **Enter the ADL score for each item.**

| Self-Performance Column 1 = | | Support Column 2 = | ADL Score = | SCORE |
|---|---|---|---|---|
| -, 0, 1, 7, or 8 | and | (any number) | 0 | G0110A = __ |
| 2 | and | (any number) | 1 | G0110B = __ |
| 3 | and | -, 0, 1, or 2 | 2 | G01101 = __ |
| 4 | and | -, 0, 1, or 2 | 3 | |
| 3 or 4 | and | 3 | 4 | |

**STEP # 2**

To calculate the ADL score for eating (G0110H), use the following chart. Enter ADL score.

| Self-Performance Column 1 (G0110H) = | | Support Column 2 = | ADL Score = | SCORE |
|---|---|---|---|---|
| -, 0, 1, 2, 7, or 8 | and | -, 0, 1, or 8 | 0 | G0110H = __ |
| -, 0, 1, 2, 7, or 8 | and | 2 or 3 | 2 | |
| 3 or 4 | and | -, 0, or 1 | 2 | |
| 3 | and | 2 or 3 | 3 | |
| 4 | and | 2 or 3 | 4 | |

**STEP # 3**

Add the four scores for the total ADL score. This is the **RUG-IV TOTAL ADL SCORE.** The total ADL score ranges from 0 through 16.

<strong>TOTAL RUG-IV ADL SCORE</strong> _____

CMS's RAI 3.0 Manual, CH 6: Medicare SNF PPS, 6-25, October 2018

95. The overall ADL Score ranges from 4-18. A score of 4 represents an independent resident while a score of 18 represents a totally dependent resident. Reimbursement levels differ based on the ADL score.

## C. The New York Medicaid Program

96. Authorized under Title XIX of the Social Security Act, Medicaid is a means-tested individual and state entitlement program jointly financed by states and the federal government. To be eligible for the New York Medicaid program, individuals must receive

Supplemental Security Income (SSI) or meet certain income, resource, age, or disability requirements.[7]

97. The New York Medicaid program covers medically necessary skilled therapy services. Under the program, restorative or long term physical, occupational, or speech therapy services are considered medically necessary when:

- The therapy services require the skills of, and are delivered by, a qualified practitioner; and

- The beneficiary has been evaluated or reevaluated for continuation of therapy services, and has an established treatment plan with reasonable and attainable goals that can be objectively measured by the use of standardized or nonstandardized measures and tools; and

- The beneficiary has an identifiable clinical condition/diagnosis, is symptomatic, and the therapeutic interventions are directed at preventing disability and/or regression, improving, adapting, or restoring functions impaired or lost as a result of a specific illness, injury, neurodevelopmental disease or condition, surgery, loss of a body part, or congenital abnormality; and

- Therapeutic benefit has not been reached and the therapeutic interventions are for conditions that require the unique knowledge, skills, and judgment of a qualified practitioner and cannot or have not been met by a comprehensive maintenance services program or home program; and

- There is reasonable expectation that the therapeutic interventions, based on a beneficiary's rehabilitation potential, will result in objective/measurable functional outcomes within a reasonable and predictable period of time and the outcomes are documented in the beneficiary's file; and

- The treatments are not routine education, training, conditioning, or fitness and the beneficiary's function could not reasonably be expected to improve as they gradually resume normal activities; and

- The treatments are not a duplicate therapy; and

- The treatments are not solely recreational (such as hobbies and/or arts and crafts), and

---

[7] https://www.health.ny.gov/health_care/medicaid/program/longterm/

- The beneficiary has not refused therapy.

*See* New York State Medicaid Program, Rehabilitation Services Manual Policy Guidelines, Section III – Coverage Criteria, Version 2019 -1.[8]

98.     The New York Medicaid program uses the case mix payment system for the purposes of reimbursement. It uses the 53 Group RUG-III Classification System model, version 5.20. *See* CMS' RAI Version 3.0 Manual, NY Appendix A.[9] The table below summarizes how the CMI score is calculated under the New York Medicaid Program.

[8] https://www.emedny.org/ProviderManuals/RehabilitationSrvcs/PDFS/Rehabilitation_Manual_Policy_Guidelines.pdf
[9] https://www.health.ny.gov/professionals/nursing_home_administrator/docs/ny_mds_3.0_errata_appendix_a.pdf

| New York State Medicaid SNF Case-Mix | | | | | | | |
| RUG III Version 5.20.53 Groupers | | | | | | | |

| Resource Utilization Group (RUG) | | ADL Index | Non ADL End Splits | RUG | Index Max | CMI |
|---|---|---|---|---|---|---|
| **Rehabilitation** | | | | | | |
| **Ultra High** Tx. 720 mins. a week minimum AND 2-3 Disciplines: one 5+days, one 3+days | | 16 - 18<br>7 - 15<br>16 - 18<br>9 - 15<br>4 - 8 | Extensive Service Qualifier<br>Extensive Service Qualifier | RUX<br>RUL<br>RUC<br>RUB<br>RUA | 1<br>2<br>5<br>10<br>15 | 2.38<br>1.98<br>1.82<br>1.53<br>1.37 |
| **Very High** Tx. 500 mins. a week minimum AND At least 1 discipline for at least 5 days | | 16 - 18<br>7 - 15<br>16 - 18<br>9 - 15<br>4 - 8 | Extensive Service Qualifier<br>Extensive Service Qualifier | RVX<br>RVL<br>RVC<br>RVB<br>RVA | 4<br>9<br>11<br>14<br>22 | 1.82<br>1.61<br>1.53<br>1.19<br>1.15 |
| **High** Tx. 325 mins. a week minimum AND 1 discipline, 5 days a week | If 5 day or Road/Wtrn : >519 min. = 7 days by day 15 & 65+ Min by AND | 13 - 18<br>7 - 12<br>13 - 18<br>8 - 12<br>4 - 7 | Extensive Service Qualifier<br>Extensive Service Qualifier | RHX<br>RHL<br>RHC<br>RHB<br>RHA | 8<br>12<br>13<br>18<br>25 | 1.62<br>1.51<br>1.4<br>1.27<br>1.12 |
| **Medium** Tx. 150 mins. a week 5 days across 3 disciplines | If 5 day or Road/Non > 239 min. > 7 days by day 15 | 15 - 18<br>7 - 14<br>15 - 18<br>8 - 14<br>4 - 7 | Extensive Service Qualifier<br>Extensive Service Qualifier | RMX<br>RML<br>RMC<br>RMB<br>RMA | 3<br>6<br>19<br>20<br>21 | 1.56<br>1.34<br>1.27<br>1.22<br>1.17 |
| **Low** 3 + days Tx / 45 min/wk; > 5 days; 2 or more Nursing Rehab | | 7 - 18<br>14 - 18<br>4 - 13 | Extensive Service Qualifier | RLX<br>RLB<br>RLA | 17<br>23<br>32 | 1.34<br>1.15<br>0.95 |
| **Extensive Services** (ADL < 7 = SSA) IV/IV medications, Suctioning, Tracheostomy care, Ventilator / Respirator | | 7 - 18<br>7 - 18<br>2 - 18 | | SE3<br>SE2<br>SE1 | 7<br>16<br>24 | 1.7<br>1.37<br>1.15 |
| **Special Care** (ADL < 7 = CA) | | 17 - 18<br>15 - 16<br>7 - 14 | Not Used<br>Not Used<br>Not Used | SSC<br>SSB<br>SSA | 26<br>28<br>29 | 1.32<br>1.06<br>1.05 |
| **Clinically Complex** | | 17 - 18 D<br>17 - 18<br>12 - 16 D<br>12 - 16<br>4 - 11 D<br>4 - 11 | Sign of Depression<br><br>Sign of Depression<br><br>Sign of Depression<br>Spec Care qualifier (ADL < 7) | CC2<br>CC1<br>CB2<br>CB1<br>CA2<br>CA1 | 27<br>30<br>31<br>33<br>34<br>39 | 1.12<br>0.98<br>0.91<br>0.86<br>0.84<br>0.77 |
| **Impaired Cognition** Cognitive impairment based on RUG III Cognitive Performance Scale (CPS) | | 9 - 10<br>6 - 10<br>4 - 5<br>4 - 5 | Nursing Rehab (2 or more)<br>Not receiving<br>Nursing Rehab (2 or more)<br>Not Receiving | IB2<br>IB1<br>IA2<br>IA1 | 85<br>37<br>45<br>47 | 0.88<br>0.86<br>0.72<br>0.67 |
| **Behavior Only** 4 + days a week - wandering, physical, verbal abuse, inappropriate behaviour, resists care; or hallucinations, or delusions checked | | 6 - 10<br>8 - 10<br>4 - 5<br>4 - 5 | Nursing Rehab (2 or more)<br>Not receiving<br>Nursing Rehab (2 or more)<br>Not Receiving | BB2<br>BB1<br>BA2<br>BA1 | 42<br>44<br>50<br>52 | 0.76<br>0.73<br>0.61<br>0.53 |
| **Physical Function Reduced** No clinical conditions captured or maximizer override<br><br>Nursing Rehab Activities > 1, 6+days per week Passive or Active ROM*, amputation care, splint care Training in dressing, grooming, eating or swallowing Transfer, bed mobility or walking*, communication, scheduled Toileting program or bladder retraining* * Count as one service even if both provided | | 16 - 18<br>16 - 18<br>11 - 15<br>11 - 15<br>9 - 10<br>9 - 10<br>6 - 8<br>6 - 8<br>4 - 5<br>4 - 5 | Nursing Rehab (2 or more)<br>Not receiving<br>Nursing Rehab (2 or more)<br>Not Receiving<br>Nursing Rehab (2 or More)<br>Not receiving<br>Nursing Rehab (2 or more)<br>Not Receiving<br>Nursing Rehab (2 or More)<br>Not receiving | PE2<br>PE1<br>PD2<br>PD1<br>PC2<br>PC1<br>PB2<br>PB1<br>PA2<br>PA1 | 36<br>38<br>40<br>41<br>43<br>46<br>49<br>48<br>51<br>53 | 0.88<br>0.86<br>0.81<br>0.79<br>0.74<br>0.72<br>0.65<br>0.64<br>0.53<br>0.51 |

ADL Data[10]

99.     Each SNF submits a roster of its Medicaid residents every January (reflecting the

facility's CMI from July of the previous year) and July (reflecting an update of each facility's

[10] https://www.adldata.org/wp-content/uploads/2015/06/MDS_3_RUG_53_Groups.pdf

CMI to January of the current year)[11] to the state's Department of Health (DOH). DOH assigns a CMI to the facility which indicates resources utilized by its Medicaid residents. The facility's payment rate is then adjusted based on this index.

## VI.  DEFENDANTS' FRAUDULENT SCHEME

100.    When new patients are admitted to a Defendant SNF, they undergo an admission process. The hospitals send the facility the patients' records, which include the patients' biographical information, insurance information, medical history and diagnoses, medications, course of treatments, family history, and rehab notes. Defendants' admissions personnel input this information into the Point-Click-Care ("PCC") system and place a face sheet in the patients' paper charts. Once that is completed, the patients are evaluated by one or more of Defendants' therapists and a plan of care for the patients is entered into the company's computer system, Rehab Optima.

### A. Defendants' practices that caused false claims for unreasonable, unnecessary or unskilled therapy services, or for therapy that was not provided as reported

101.    Significantly, the treatment plan written by Defendants' therapists does not specify the number of minutes of therapy a patient should receive. Instead, the amount of therapy and the therapy schedules are set by the Director of Rehab at each and every Defendant SNF based upon the patient's insurance provider and the company's mandates. The Directors of Rehab do not take into account, as the regulations require, the patients' medical needs, the therapists' observations of the patients, or the patients' tolerances for the therapy before

---

[11] New York DOH, *Benchmark letter*, May 14, 2018 (https://www.health.ny.gov/facilities/long_term_care/reimbursement/nhr/benchmark/docs/2018-05-14_benchmark_letter.pdf)

projecting the RUG level and scheduling the therapy minutes. Therapy schedules are knowingly designed to meet financially driven corporate mandates and not patients' medical needs. This is a clear violation of law.

102. For example, nearly all newly admitted Medicare Part A patients are automatically and presumptively placed into the Ultra High RUG level which generates the highest reimbursement from Medicare. Medicare Part A patients are prioritized over other payors' beneficiaries because of the RUG system, and therapists are mandated to meet all the scheduled minutes for Medicare Part A patients regardless of the patients' condition. Even when the patients cannot tolerate such high levels of therapy and refuse to participate, the therapists are forced by their supervisors to treat the patients and invoice for it. *See* Section C and patient examples 19-27 herein. In addition, they are also forced to bill for unskilled services, such as brushing patients' hair or watching patients sleep, just to meet the minutes. *See* Section F and patient examples in paragraphs 269-70 herein.

103. Defendants also maintain lists of Medicare Part B and Medicaid patients to be admitted to skilled therapy services (or "picked up" for therapy) following an evaluation during the Case Mix cycles in order to increase the CMI score. The facility's Director of Rehab helps create the lists and instructs therapists to pick up these patients during the biannual "CMI meetings." These lists are also distributed to the facility's Nursing Department so that the nurses start documenting a decline in the patients' conditions to justify the therapy screens/evaluations. Some therapists refuse to pick up the patients because they do not believe the patients are appropriate for therapy, but the Director of Rehab insists that they pick up the patients for at least five days for maintenance, long enough to "capture the score" (rendering the necessary minutes to meet the RUG level). *See* Section D and patient examples 28-29 herein.

104. If patients still refuse to participate in therapy despite the therapists' multiple attempts and have not met the scheduled minutes, the therapists are instructed to "fix" their minutes and invoice for the full session anyway. This means that Defendants falsify the minutes to bill for services that were not provided in order to meet metrics and increase reimbursements. *See* Section B herein and patient examples 1-17 herein.

105. In addition, Defendants' Directors of Rehab purposefully and systematically delay patient discharges in order to increase reimbursements. As a result, patients continue to receive services which exceed and override the therapists' specific recommendations, without any clinical consideration for the patients' needs or their medical necessity. Relators have observed that the building's Administrator, who does not have a medical background, had an influence on whether patients were picked up for therapy and was involved in determining whether patients should be discharged. *See* Section G herein.

106. Defendants' corporate mandates supersede the therapists' clinical judgements and patients' medical needs. Text messages show that therapists become confrontational in an effort to resist these mandates, but eventually acquiesce to the Director of Rehab and management.

**B. Billing for therapy that was not provided in order to increase reimbursements**

107. Because therapy is scheduled to meet corporate mandates rather than patients' medical needs, patients frequently cannot tolerate the minutes of therapy they are scheduled to receive. Missed therapy minutes lower the patients' RUG scores and the facility's Case Mix score during the CMI cycle, which in turn affects the facility's Medicare and Medicaid reimbursements. When patients refuse therapy, the Director of Rehab requires the therapists to go back to see the patients multiple times a day in order to get all the scheduled minutes. When the therapists are unable to render all the scheduled minutes, the Director of Rehab instructs the

therapists to "fix" their minutes. This means that the therapists are instructed by their supervisors to falsify their records to include time for therapy that did not occur. The Director of Rehab ("DOR") instructs the therapists to go back, oftentimes days later, and add any previously missed therapy minutes to the patient's record so that the facility will meet its projected metrics.

<u>Patient Examples</u>

108. By way of illustration, the following are examples of patients from the Pawling facility whose insurance was billed for therapy that was not provided.

**Patient One**

109. Patient 1 was admitted to skilled therapy services as a Medicare Part A patient on June 9, 2017. On August 4, 2017, Maria Tiernan, PTA, sent a text message to the Pawling group chat about Patient 1. She wrote: "[Patient 1] ref [refused] PT and OT. 'I don't feel well I have a migraine and I am shaking all over. I even canceled my doctor appt for today.'" DOR Siddam replied: "I don't have a therapist tomorrow to try and make up the minutes. Please try and get some at least." The Treatment Log shows that the patient was sick and had a physician hold for physical and occupational therapy on August 4. Four days later, on August 8, 2017, DOR Siddam sent a text message to the group chat stating: "Maria or Liz, Can one of you put in 15 for [Patient 1] on last Friday because we will have no score otherwise. Thanks". Liz Noonan, Occupational Therapist, replied: "I'll do it." The treatment log shows that the note stating that the patient had a physician hold on August 4 was deleted and Ms. Noonan added 15 minutes of occupational therapy to the patient's record for August 4 pursuant to DOR Siddam's instructions. The Projections chart shows that 15/65 minutes of occupational therapy were billed, but 0/75 minutes of physical therapy were billed on August 4. These records were false. Patient 1 did not receive treatment on August 4.

110. On August 7, 2017, Maria Tiernan, PTA, sent a text message to the group stating: "[Patient 1] is ref again…I tried several times." DOR Siddam replied: "I really don't have the energy to answer all this. I'm heading to the doctors now. Please do your best. Medicares need their minutes." Ms. Tiernan replied: "Ok but we are trying. Do you want us to talk to Yosef [Spierer, Pawling Administrator]. Maybe he can talk to them." DOR Siddam replied: "No please that will only give me more stress. He will want me to come in… It's not yosef [sic] but we have to keep our medicare [sic] scores especially when we have only a few of them." Ms. Tiernan replied: "I do not know what you want me to do??? When a pt is screaming at me." DOR Siddam replied: "Just give her some time and try again. If she does the same then we can't do anything. Let mary [sic] know." Mary O'Conner was the Social Worker at Pawling.[12] The Projections report shows that 10/85 minutes of physical therapy and 60/85 minutes of occupational therapy were billed on August 7, 2017. These records were false. Patient 1 did not receive treatment on August 7.

111. Kathryn Lebel's Daily Activity Schedule shows that she was scheduled to provide 60 minutes of physical therapy to Patient 1 on June 30, 2017. However, the Treatment Log shows that the patient was sick and did not receive physical therapy that day. This note is crossed-out, however, and the note replacing it shows that DOR Siddam billed for 15 minutes of physical therapy that day. Relators do not know if DOR Siddam provided any therapy to the patient that day.

112. On September 5, 2017, Patient 1 was receiving therapy as a Medicare Part B patient. From 75 minutes of occupational therapy and 75 minutes of physical therapy that she

---

[12] She resigned shortly before Relator Rosenberger was terminated in spring of 2018.

received as a Medicare Part A patient in order to meet the RU level, the patient was now scheduled to receive 30 minutes of each. Also, because she was no longer a Medicare Part A patient, she was no longer prioritized and the DOR did not push the therapists to get all the scheduled minutes. For example, September 8, 2017, DOR Siddam sent a message to the group chat stating: "Give med a's to cotas and have them miss...[Patient 1]..." The Projections chart shows that 0/30 minutes of occupational therapy were billed that day.

**Patient Two**

113.    On January 5, 2018, Relator Rosenberger sent a text message to DOR Siddam about Patient 2. She wrote: "Divya [Patient 2] is in bed. I tried to eval him twice. He is telling no and won't participate." DOR Siddam replied: "Really need him on. Please retry." Relator Rosenberger did not pick up the patient for speech therapy.

114.    On January 9, 2018, DOR Siddam sent a text message to Pinky Buque, Physical Therapist, on the Pawling group chat about the patient. She wrote: "Pinky can you check if [Patient 2] wants to do PT for walking." On January 12, 2018, Ms. Buque sent DOR Siddam a text message about the patient stating: "Div, [Patient 2] refused to do therapy." The DOR replied: "Oh. Let's try next week again." The patient was finally picked up for physical therapy on January 22, 2018 as a Medicare Part B patient.

115.    On January 23, 2018, Richard ("Rick") Bucalo, Physical Therapy Assistant ("PTA"), sent a text message to the Pawling group chat about the patient. He wrote: "[Patient 2] refused. Won't get out of bed." The Treatment Log shows that zero minutes of physical therapy were billed on January 23rd because the patient "Refused Treatment." The next day, on January 24th, Relator Retig overheard a conversation between DOR Siddam and Mr. Bucalo regarding the patient's minutes. The DOR asked the PTA to go back and bill minutes for the prior day's

session. The Treatment Log shows the note stating that the patient refused treatment is crossed-out and 15 minutes of physical therapy were added and billed for January 23. This report was false because it overstated the treatment actually provided to Patient 2.

116. The Projections report shows that the patient received therapy for five consecutive days and was discharged on January 31, 2018.

**Patient Three**

117. Patient 3 was admitted to skilled therapy services as a Medicare Part B patient on November 27, 2017. On December 1, 2017, at 7:05 p.m., DOR Siddam sent a text message to Amanda Knapp, Occupational Therapist, on the Pawling group chat about Patient 3. She wrote: "Amanda, [Patient 3's] ard was today I see you didn't bill him for the full time and i was not notified…. We have carefully tried to manage these minutes so that we can capture for cmi and don't have to pick them up again. Please correct the minutes if you can on Monday for both. Thanks." The Projections chart shows that the patient was scheduled for 40 minutes of occupational therapy that day. The Treatment Log shows that Ms. Knapp initially only billed for 15 minutes of occupational therapy with the patient.

118. On Monday, December 4, 2017, DOR Siddam sent another text message to the group chat about the patient. She wrote: "Amanda…Can you please fix your minutes for [Patient 3]…Thanks." The Treatment Log shows that the note for 15 minutes of occupational therapy on December 1 is crossed-out and Ms. Knapp instead billed for 40 minutes of occupational therapy on December 1st pursuant to DOR Siddam's instructions. This Treatment Log entry was false. Patient 3 did not receive 40 minutes of treatment on December 1.

119. This patient passed away on January 10, 2018.

**Patient Four**

120.   Patient 4 was admitted to skilled therapy services as a Medicare Part B patient on April 19, 2019. She was scheduled to receive 53 minutes of occupational therapy on April 23, 2019, but refused to participate. Relator Retig sent a message to DOR Siddam stating: "[Patient 4] refusing straight out argued with me." DOR Siddam replied: "[Patient 4] need [sic] at least 15 please." Relator replied: "Will try." However, the patient continued to refuse treatment so Relator Retig did not bill for therapy on that day and noted the same in the Treatment Log.

121.   The next time she worked at the facility, Relator Retig noticed that Kerri Stanisic (formerly Miller), Occupational Therapist and Assistant DOR, had deleted Relator's note that the patient refused had treatment and had billed for 15 minutes of occupational therapy on April 23. Relator Retig does not know if Ms. Stanisic actually rendered any therapy to the patient on that day, but she observed that the patient refused treatment despite the Relator's multiple attempts. Ms. Stanisic was scheduled to treat eight patients that day, most of whom were Medicare Part A patients with high minutes, and this patient was not on her schedule.

122.   Because she did not get all of the scheduled occupational therapy minutes on April 23, the patient received 10 minutes of occupational therapy in addition to the time scheduled for her on April 24, 2019. The patient also received 45 minutes of unscheduled physical therapy on April 23. Relator believes that Patient 3 did not receive occupational therapy on April 23, and these records are therefore false.

**Patient Five**

123.   Patient 5 was admitted to skilled therapy services on or about December 29, 2017 as a Medicare Part A patient. On January 10, 2018, DOR Siddam sent a message to the Pawling group chat regarding Patient 5. She wrote: "Rick or amanda [sic] need at least 15 for [Patient 5]

yesterday. Didn't realize we would have no score." Amanda Knapp, Occupational Therapist, replied: "Ok I can do that for [Patient 5]." The Treatment Log shows that, originally, no occupational therapy was billed for this patient on January 9 and the reason for the missed visit was listed as "Sick." However, this note was crossed-out and Ms. Knapp added and billed for 15 minutes of occupational therapy on January 9 pursuant to DOR Siddam's instructions. The patient's next checkpoint was the next day, on January 11, 2018. The Treatment Log entry was false. Patient 5 did not receive treatment on January 9.

**Patient Six**

124. Patient 6 was admitted to skilled therapy services as a Medicare Part A on August 27, 2017. The Projections chart shows that Patient 6 was scheduled to receive 45 minutes of occupational therapy on September 18, 2017. However, the Treatment Log shows that Amanda Knapp, Occupational Therapist, treated the patient on September 18 and had billed only 30 minutes for the session. On September 19, 2017, DOR Divya sent a message to the Pawling group chat regarding the patient. She wrote: "Amanda [Patient 6]'s mins for yday [sic] were 45, please fix the mins. Thanks." The Treatment Log shows that Ms. Knapp's original note was deleted and she instead billed for 45 minutes of occupational therapy, pursuant to the DOR's instructions. The Treatment Log entry was false. Patient 6 did not receive 45 minutes of occupational therapy on September 18.

**Patient Seven**

125. Patient 7 was admitted to skilled therapy services on August 14, 2017 as a Medicare Part A patient. Patient 7 was scheduled to receive 35 minutes of physical therapy on Friday, August 25, 2017. The Treatment Log shows that Pinky Buque, Physical Therapist, treated the patient that day and billed for 30 minutes of physical therapy. On Monday, August

28, 2017, DOR Divya sent a message to the Pawling group chat regarding the patient. She wrote: "Pinky you billed 30 for [Patient 7] for last Friday instead of 35. Please fix it. Thanks." The Treatment Log shows that Ms. Buque deleted the note billing for an activity that lasted 10 minutes and replaced it with a note billing for an activity that lasted 15 minutes, for a total of 35 minutes of physical therapy on August 25, 2017. This was done to meet the minimum amount of therapy needed to reached the pre-planned RUG level because the patient's next checkpoint was on August 26, 2017. The Treatment Log entry was false. Patient 7 did not receive 35 minutes of physical therapy on August 25.

**Patient Eight**

126. Patient 8 was admitted to skilled therapy services on February 2, 2018 as a Medicare Part A patient. On February 5, 2018, DOR Siddam approached Relator Retig to discuss Patient 8, whom the Relator was scheduled to treat on that day. The Projections chart shows that the patient had not received therapy on February 3 or 4, and was scheduled to receive 50 minutes on February 5. The DOR told Relator Retig that she must see the patient because the patient would not reach the RUG score if she missed therapy three days in a row. The DOR told Relator Retig that the patient might try to refuse therapy or say that she is tired when she returns from her appointment, but she needs at least 15 minutes of occupational therapy in order to meet her score. Relator Retig rendered 50 minutes of occupational therapy.

127. On February 26, 2018, Relator Retig heard Rick Bucalo, PTA and Acting DOR at the time, tell Patient 8 that he could not treat the patient that day because she came down to the therapy session too late. He said: "I told you I had to leave at 4:00 p.m. I can't see you." He added that wheeling herself downstairs counts towards her therapy and instructed the patient to do leg exercises after occupational therapy. The Treatment Log shows that Mr. Bucalo billed 60

minutes of physical therapy on that day. The treatment log was false. Patient 8 did not receive physical therapy on February 26.

**Patient Nine**

128.    Patient 9 was admitted to skilled therapy services on or about January 5, 2018 as a Medicaid patient. On January 8, 2018, Pinky Buque, PTA, sent DOR Siddam a text message on the group chat about Patient 9. She wrote: "Div, [Patient 9] is sick today, vomiting." The DOR replied: "Need at least 15." The Treatment Log shows that Ms. Buque billed for 15 minutes of physical therapy on this day. Relators do not know if Ms. Buque actually rendered any physical therapy to the patient that day, but it is documented that the patient could not tolerate it.

**Patient Ten**

129.    Patient 10 was admitted to skilled therapy services on February 24, 2018 as a Medicare Part A patient. On May 3, 2018, Relator Retig heard Rick Bucalo, PTA, say that he could not treat Patient 10 because she came down to therapy at 4:00pm and it was too late. The Projections chart shows that the patient was scheduled for 75 minutes of physical therapy that day and her checkpoint was the next day, on May 4. If she did not receive the schedule minutes, she would not have met the RUG level. The Treatment Log shows that Mr. Bucalo billed for 75 minutes of physical therapy on May 3 despite his statement. The treatment log was false. Patient 10 did not receive physical therapy on May 3.

**Patient Eleven**

130.    On March 11, 2019, Relator Retig informed Assistant DOR, Kerri Stanisic (formerly Miller), that Medicare Part B patient 11 refused to participate in occupational therapy. Ms. Stanisic replied: "Well, she needs to be seen. I will switch one with you." Ms. Stanisic was working with another patient and then said: "Ok, I'm going to try to see [Patient 11]." She went

upstairs for about five minutes and came back down. Relator Retig asked Ms. Stanisic: "I guess no luck?" Ms. Stanisic replied: "No, well I actually did some feeding. I'm going to go back before I leave." Relator Retig did not see Ms. Stanisic go back upstairs to see the patient the rest of the day. Ms. Stanisic finished the therapy session she was working on and left. The Treatment Log shows that Ms. Stanisic billed for 38 minutes of occupational therapy that day for this patient. The treatment log was false. Patient 11 did not receive 38 minutes of occupational therapy on March 11.

**Patient Twelve**

131.   Patient 12 was admitted to skilled therapy services on November 3, 2017 as a Medicare Part B patient. On November 7, 2017, DOR Siddam sent a text message to the Pawling group chat about Patient 12. She wrote: "Elizabeth, [Patient 12] was 40 minutes yday [sic] not 30. Please see her for 40 today. Thanks." Elizabeth Varghese, PTA, replied: "I will fix it as soon as possible sorry." DOR Siddam responded: "That's ok. If you fix it for yday you can only see her for 30 today." The Treatment Log shows that Ms. Barbour billed for 46 minutes of physical therapy on November 6 (31 minutes of one activity and 15 minutes of another activity). Relators do not know if Ms. Varghese actually provided the additional 16 minutes of physical therapy she billed for on November 6. The Treatment Log shows that she billed for 41 minutes of physical therapy on November 7, the day DOR Siddam sent the text message.

**Patient Thirteen**

132.   Patient 13 was admitted to skilled therapy services on or about June 14, 2018 as a Medicare Part A patient. The Treatment Log shows that on June 19, 2018, Rick Bucalo, PTA, did not bill for physical therapy because the patient was "Out of Facility." Relator Retig observed that the patient's next checkpoint was coming up and the patient would have only

reached the High RUG level if he did not receive therapy on June 19. To avoid this, Mr. Bucalo deleted the note that the patient missed the session on June 19 and instead billed for 15 minutes of physical therapy on that day. Relator Retig saw in the Projections report that this change allowed the facility to capture the Very High RUG level with 501 minutes of therapy. The treatment log was false. Patient 13 did not receive physical therapy on June 19.

133. On June 28, 2018, Amanda Knapp, Occupational Therapist, showed Relator Retig text messages between her and DOR Siddam regarding Ms. Knapp's vacation. While reading through the text messages, Relator Retig saw a message from DOR Siddam stating: "Amanda you only billed 80 for [Patient 13], please add an extra few minutes." Relator Retig believes that this text message referred to the patient's prior treatment day. The patient was discharged from therapy on or about June 27, 2018.

**Patient Fourteen**

134. Patient 14 was admitted to skilled therapy services on or about October 30, 2017 as a Medicare Part A patient. The Projections chart shows that on Thursday, November 30, 2017, Patient 14 was scheduled to receive 65 minutes of physical therapy. On Friday, December 1, 2018 DOR Siddam sent a text message to the Pawling group chat about the patient. She wrote: "Elizabeth, [Patient 14] ard [sic] is set for tomorrow and you didn't bill her full time yesterday and i [sic] was not notified… We have carefully tried to manage these minutes so that we can capture for cmi and don't have to pick them up again. Please correct the minutes if you can on Monday for both. Thanks." Ms. Varghese replied: "[Patient 14] had 10/10 pain."

135. On Monday, December 4, DOR Siddam sent another message to the Pawling group chat about the patient's missed minutes. She wrote: "Elizabeth… Can you please fix your minutes for…[Patient 14]. Thanks." The Treatment Log shows that Ms. Varghese ended up

billing for 75 minutes of physical therapy on November 30. The treatment log was false. Patient 14 did not receive 75 minutes of physical therapy on November 30, 2017.

**Patient Fifteen**

136.    Patient 15 was admitted to skilled therapy services on or about March 26, 2018 as a Medicare Part A patient. The Projections chart shows that Patient 15 was scheduled to receive 75 minutes of both physical and occupational therapy on April 3, 2018. DOR Siddam handwrote on Relator's Retig schedule: "[Patient 15], B 75 minutes * Medicare unit 200. Has to be seen for full time pls [sic]." (emphasis in original). The patient was at a dialysis appointment most of the day. Relator Retig went to treat the patient after he ate, shortly after he returned from his dialysis appointment. She treated the patient in his room for 30 minutes because the patient did not want to go downstairs to the therapy area. Rick Bucalo, PTA, walked into the room towards the end of the patient's occupational therapy session. At that point, the patient said that he needed to go to the restroom so Relator Retig and Mr. Bucalo both left the patient's room and walked downstairs together. Relator Retig told Mr. Bucalo that she was only able to render 30 minutes of therapy. Mr. Bucalo told the Relator that he would bill for the same and walked over to the facility's computers to enter the minutes. Relator Retig saw that he did not go back upstairs to provide additional therapy to the patient. The Treatment Log shows that Mr. Bucalo billed for 30 minutes of physical therapy on April 3 even though he did not render treatment. This treatment log was false.

137.    On April 12, 2018, Relator Retig was scheduled to provide 75 minutes of occupational therapy to the patient. Relator Retig informed DOR Siddam that the patient would not be able to participate in 75 minutes of therapy because he had just returned from dialysis.

DOR Siddam asked the Relator to work on feeding the patient in order to get minutes but the patient was able to independently feed himself. Approximately 15 minutes after Relator Retig saw the patient, she asked Maria Tiernan, PTA, if she had seen the patient for physical therapy yet. Ms. Tiernan said she had. Relator Retig asked when she would be done with the session because she needed to go back and render more minutes as well. Ms. Tiernan said that she was already done with the patient, adding: "I toileted him so am charging full time." The Treatment Log shows that Ms. Tiernan billed for 65 minutes of physical therapy on April 12, 2018 even though Relator Retig observed that she did not treat the patient for that long. This treatment log was false.

**Patient Sixteen**

138. Patient 16 was admitted to skilled therapy services on December 26, 2017 as a Managed Medicare Part A patient. The Projections chart shows that Patient 16 was scheduled to receive 30 minutes of concurrent physical and occupational therapy on January 9, 2018. On January 10, 2018, DOR Siddam sent a text message to the Pawling group chat about the patient. She wrote: "Also [Patient 16] for yesterday, pinky [sic] or amanda [sic] any time at all?" Pinky Buque, physical therapist, replied: "I did not see [Patient 16] yesterday div, he's not back until past 3."

139. The Treatment Log shows that Ms. Buque billed for 15 minutes of physical therapy on January 9, 2018 although she stated that she did not treat the patient that day. This treatment log was false.

**Patient Seventeen**

140. The Projections chart shows that Medicare Part A Patient 17 was scheduled to receive 45 minutes of speech therapy, 40 minutes of occupational therapy, and 50 minutes of

physical therapy on April 9, 2018. The patient went to dialysis in the mornings, Monday through Friday, and returned to the facility around 11:30-11:45am. On April 9, she also had to go to a doctor's appointment. Relator Rosenberger and the physical therapist were able to treat the patient before her doctor's appointment, but could not render all the scheduled minutes. The occupational therapist was not able to see the patient before her appointment. The patient's checkpoint was the next day. Relator Rosenberger heard the DOR ask the COTA[13] later on to bill for 15 minutes of occupational therapy. The COTA agreed, although no occupational therapy was provided. The Projections chart shows that 15/40 minutes of occupational therapy were billed that day. That entry on the chart was false.

141. On the same day, April 9, 2018, Relator Rosenberger notified the DOR that she was not able to complete the scheduled 45 minutes of therapy that day - she only billed 15/45 minutes. The DOR asked Relator Rosenberger if she could see Patient 17 for 75 minutes the next day so that they can get the minutes needed to reach the Ultra High RUG level. Relator Rosenberger refused to do so, explaining that the patient could not tolerate such a long session and it would not appropriate. The patient was usually scheduled for 45 minutes of speech therapy. The DOR then asked Relator Rosenberger if she could break up the treatment into two sessions during the day in order to get the 75 minutes. Relator Rosenberger disagreed and refused. Relator Rosenberger was terminated 10 days later.

142. Because Patient 17 missed minutes, she did not meet the Ultra High RUG level at the next checkpoint. As such, the length of the patient's therapy sessions decreased from 45-60 minutes to 30 minutes over the next few days. For example, the patient was scheduled to receive

---

[13] Relator Rosenberger does not recall the COTAs name at this time.

50 minutes of physical therapy, 65 minutes of occupational therapy, and 45 minute of speech therapy on April 4. However, because she had only received 665 minutes of therapy by the April 10 checkpoint date and had dropped to Very High RUG, she was scheduled to receive only 30 minutes of each discipline in the next three days. This change was not based on therapists' recommendations, but on the RUG system.

143. On February 23, 2018, Relator Retig observed the patient sitting in her chair in the gym sleeping and Skip Baker, Occupational Therapist, was sitting next to her. The Treatment Log shows that Mr. Baker billed for 45 minutes of occupational therapy that day. The treatment log was false.

**Patient Eighteen**

144. Patient 18 was admitted to skilled therapy services on September 20, 2017 as a Medicare Part A patient. The Projections chart shows that Patient 18 was scheduled to receive 75 minutes of occupational therapy on November 1, 2017. Occupational Therapist Amanda Knapp sent a message to the Pawling group chat that day stating: "[Patient 18] was sick today only got 45 with him." DOR Siddam responded: "Need his minutes for cmi please. If not we will lose the score." The Projections chart shows that only 45 minutes of occupational therapy were billed that day so Ms. Knapp did not bill for more therapy than she rendered to the patient this time, contrary to the DOR's request. As a result, the patient missed 30 minutes of therapy on November 1, 2017. To make up for those minutes, the patient was scheduled for and received 85 minutes of occupational therapy the next two days, more than any other day, in order to meet the pre-assigned RUG score.

### C. Presumptively placing nearly all newly admitted Medicare Part A patients into the highest therapy reimbursement levels, regardless of medical necessity

145. Defendants place nearly all new Medicare Part A admittees in the Ultra High RUG level ("RU"). Medicare regulations require that a minimum of 720 minutes of therapy per week be provided to patients to meet the RU category. The rest of the Medicare Part A patients are usually placed in the Very High RUG level ("RV"), which requires a minimum of 500 minutes of therapy per week. Defendants prioritize Medicare Part A patients to ensure that they get all the minutes necessary to meet the target RUG level. Most patients at the Defendant SNFs did not need this much therapy and, as is shown herein, could not tolerate it. By engaging in these practices, Defendants violate Medicare regulations, which specifically state that the RU level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." The patient's treatment schedules are designed to obtain certain RUG levels based on financially-driven corporate mandates.

146. Relators Rosenberger and Retig have observed that Medicare Part A patients are placed in high RUG levels regardless of medical necessity. Text messages between therapists and the DOR at the Pawling facility show that the therapists often complained to the DOR that their patients were sick and could not tolerate the therapy or had refused to participate in the session. The DOR, Divya Siddam, pressured the therapists to go back and get the scheduled minutes. If therapists did not notify Ms. Siddam that they did not render all the scheduled minutes, DOR Siddam demanded an explanation for why that was.

147. The DOR expects the therapists to do whatever is necessary to achieve all the scheduled therapy minutes for each patient. For example, therapists are instructed to go in multiple times to treat the patients in split sessions and bill for time they spent convincing the

patient to come to therapy or educating the patient/family on the importance of therapy. When a patient is still unable to tolerate the therapy or refuses to participate during the session, and thus misses scheduled minutes, Defendants shift minutes around and add those missed minutes to the next therapy session to ensure that targeted therapy reimbursement levels are achieved. This means that during the next therapy session, the patient receives the therapy minutes scheduled for that day, plus any missed minutes from the prior session, regardless of medical necessity for such therapies or ability to tolerate the increased amount of therapy. *See*, e.g., paragraphs 109 (Patient 1) and 144 (Patient 18) herein.

148. Defendants' management monitors closely whether the facilities are meeting the RUG requirements and pressures the DORs to encourage therapists to get all the scheduled minutes. For example, on August 21, 2017, DOR Siddam sent a text message to the Pawling group chat regarding the facility's RUG levels. She wrote: "Please make sure you get the allotted minutes for medicare [sic] patients. Last week our RU % [percent of patients in the Ultra High RUG category] was only 32.1. I have never had such a low score in years!! Katy [O'Connor, Chief Reimbursement Officer at The Grand] is going to be very mad at us. We have to keep up the scores this week…. Please see medicares first and get the minutes."

149. Later on that same day, DOR Siddam sent another text message stating: "All day I have been answering Katy's emails about our low rugs and productivity."

150. Then, in response to therapists' complaints that their patients cannot tolerate the therapy, DOR Siddam responded: "Guys I know the caseload is not easy but please get the minutes. Katy is very upset although I told her the type of patients we have. To be plain straight we will be in trouble if we don't pick up this week…. I will have a meeting with you all tomorrow. Will text you the time."

151. Maria Tiernan, PTA, replied: "I am not billing for people u [sic] do not see. Who is our compliance offer [sic]?"

152. DOR Siddam responded: "I'm not asking you to bill when you don't see them. I said please try to get your mins. I'm well aware of what we go through but we need to try our best too... Please don't get upset I'm trying my best to balance corporate and our team, and I need all your support. In the worst case we will have to put in a good note as to why we couldn't get the time."

153. Ms. Tiernan replied: "I think we all do our best we are not sitting around. Today I missed two treats and still had to stay after I punched out. We are dealing with humans. I know you are be pressured but they need to understand that the people they are bringing in are not ultra." In other words, Ms. Tiernan believed that the patients were improperly assigned to the Ultra High RUG level.

154. DOR Siddam replied: "I know Maria. I have explained the same to her. Having no Saturday therapy is also killing us. I'm making some changes to make this little better. I will discuss that in our meeting."

155. At this point, Amanda Knapp, Occupational Therapist, joined the conversation and replied: "Katie needs to know exactly the problems we are dealing with."

156. DOR Siddam responded: "Let's talk tomorrow. I don't want to disturb everyone in the group." She held a team meeting on August 22, 2017 at 12:15 p.m.

157. As DOR Siddam mentioned in the text message in paragraph 150, Relators have observed that many of the patients that are sent to the Pawling facility are unable to tolerate the high minutes of therapy they are scheduled to receive because they are medically compromised. These patients are very sick and fragile, overweight, on dialysis, and/or with psychiatric

problems, and although they might need some skilled therapy services, they should not be forced to endure 720 minutes of therapy per week.

158. On February 21, 2018, Relator Retig heard Rick Bucalo, PTA, who was covering for DOR Siddam while she was on vacation, comment: "We have a bad reputation at the hospitals and they send us bottom of the barrel patients." Relator Retig asked why are they "bottom of the barrel" patients and Mr. Bucalo responded: "Because they are not good rehab candidates, they don't send good rehab candidates here".

159. On November 13, 2017, DOR Siddam sent another message to the Pawling group chat about adhering to corporate mandates. She wrote: "Also Amanda Yosef [Spierer, Administrator at Pawling] wants us to look at [M.M.] if we could put her on for 1 week. Can you please see her? If need be you can give a patient to Janet if she can see… All of you please see concurrent when they are scheduled. Katy texted me that she looked at our billing and that we are not billing concurrently."

160. On January 9, 2018, DOR Siddam sent the following text message to the Pawling group chat about Medicare Part A patient W.G.: "[W.G.] is medicare. Can pt [physical therapy] at least put him on?" Pinky Buque, Physical Therapist, replied: "Il [sic] check [W.G.]." The patient was admitted to physical and occupational therapy that day.

161. On January 24, 2018, Amanda Knapp, Occupational Therapist, sent the following text message to the Pawling group chat about the same Medicare Part A patient W.G. She wrote: "I only got 15 with [W.G.]. He refused putting on splint." DOR Siddam replied: "Please try [W.G.] again need his minutes for cmi." The Treatment Log shows that Ms. Knapp billed for 30 minutes of occupational therapy that day.

162.     Relator Rosenberger observed that Medicare Part A patient L.F. was very lethargic and getting worse each day. On February 22, 2018, she saw Elizabeth Varghese, PTA, bring the patient downstairs as he was falling asleep. She attempted to lift the patient's hand and put it on the arm bike, but the patient was unable to do so. She then stated: "This is not skilled or functional." Gina Bergdall, COTA, was sitting next to the patient and agreed with Ms. Varghese's observation. Relator Rosenberger and Ms. Varghese brought the patient back upstairs. The next day, Relator Rosenberger asked Ms. Varghese if she was able to work with the patient again the prior day and get the minutes. Ms. Varghese replied: "Yes, I did wheelchair assistance with him that was my time." The Treatment Log shows that Ms. Varghese billed for 35 minutes of physical therapy and Ms. Bergdall billed for 20/35 minutes of occupational therapy on February 22, 2018. The patient went to the hospital on February 23, 2018 due to a decline in medical status.

163.     On January 1, 2018, Rick Bucalo, PTA, sent a text message to the Pawling group chat. He wrote: "Divya, Amanda, Pinky and I helped transfer [J.R.] onto a stretcher. Can we bill for it? He went out for low Sp02." DOR Siddam replied: "Sure." Mr. Bucalo response: "Great. 20 minutes each!" The Treatment Log shows that Mr. Bucalo billed for 15 minutes of physical therapy under CPT code 97112;[14] Pinky Buque billed for 15 minutes of physical therapy under CPT code 97530;[15] and Amanda Knapp also billed for 15 minutes of occupational therapy under CPT code 97530.

---

[14] Therapeutic procedure, 1 or more areas, each 15 minutes; neuromuscular reeducation of movement, balance, coordination, kinesthetic sense, posture, and/or proprioception for sitting and/or standing activities.
[15] Therapeutic activities, direct (one-on-one) patient contact (use of dynamic activities to improve functional performance), each 15 minutes.

164. Relator Retig recalls a conversation she overheard between Rick Bucalo, PTA, and Yosef Spierer, Pawing's former Administrator, on or about January 16, 2018 about Medicare Part A patient P.W. The patient was at an appointment and Mr. Bucalo told Mr. Spierer that he was waiting for the patient to return to treat her. Mr. Spierer replied: "She is Med A, so she has to be seen." The patient returned shortly after this conversation. Mr. Bucalo told Relator Retig that the patient was scheduled for 75 minutes of physical therapy that day, but Relator Retig observed that the patient participated in less than an hour of physical therapy.

165. On July 26, 2018, Relator Retig was scheduled to see patient R.D. for 30 minutes of occupational therapy. However, DOR Siddam approached her and stated: "Try to do more with him, we just found out he's Med A." She asked Relator Retig to see the patient for 75 minutes instead. Relator Retig does not recall for how long she treated the patient that day.

166. Relator Retig recalls a conversation she had with Maria Tiernan, PTA and Acting DOR while Ms. Siddam was on leave in February 2018, about Medicare Part A patients. Ms. Tiernan expressed frustration that all Medicare Part A are placed on the Ultra High or Very High RUG levels without following the therapists' recommendations.

167. Relator Retig also recalls a conversation she had with Amanda Knapp, Occupational Therapist, on February 9, 2018. Relator Retig commented how a Medicare Part A patient, whose name she does not recall at this time, was doing so well even though the patient had just started on skilled therapy services. Ms. Knapp commented: "It doesn't matter, they will try to keep them the full 30 days." Relator Retig asked why this was and Ms. Knapp responded: "That's what they do with all Med As to get the most money out of them."

168. On August 28, 2018, Relator Retig asked Elizabeth Varghese, PTA, who the person visiting the Pawling facility was. Ms. Varghese explained that her name is Claudia and

she is the Director from the Queens location. She was there to help DOR Siddam. Ms. Varghese added: "She started having us see patients for 90 minutes. They can't tolerate that, they are sick. They are in and out of the hospital." Relator Retig asked why the patients were being scheduled for such long sessions and Ms. Varghese replied: "That's what Claudia does at her facility."

169. On November 12, 2018, Relator Retig had too many patients on her schedule. Angela Parodi, Acting DOR covering for Ms. Siddam, instructed Relator Retig to make sure she treats her Medicare Part A patients first. She also added that patients on workers compensation insurance do not need to be seen.

170. On December 19, 2018, Relator Retig was scheduled to treat six patients - three Medicare Part A patients, two Medicare Part B patients, and one Managed Medicare patient. Angela Parodi, Acting DOR at the time, highlighted the Medicare Part A patients' names in blue on Relator's schedule and told the Relator that the highlighted patients were "priority."

171. The KPI Scorecard reports show that Pawling's resident population was divided between the different payors as follows between January 2016 and March 2018.

| Year | Med. A | Med. B | Medicaid | Managed Care and Others |
|---|---|---|---|---|
| 1/1/16 - 1/1/17 | 66.70% | 14.80% | 10.10% | 8.40% |
| 1/1/17 - 12/31/17 | 59.20% | 16.80% | 11.20% | 12.80% |
| 1/1/18 - 3/11/18 | 66.80% | 12.60% | 3.90% | 16.70% |

Patient Examples

172. By way of illustration, the following are examples of patients from the Pawling facility whose therapy schedules were not related to their individual medical needs but were designed to obtain the highest reimbursement from Medicare.

**Patient Nineteen**

173. On September 21, 2017, 77-year-old Patient 19 was admitted to skilled therapy services at Pawling as a Medicare Part A patient following a hospital stay. He had received treatment for rhabdomyolysis and a recent fall.

174. His medical history included: congestive heart failure, abnormal breathing, cellulitis, obesity, cataracts, arthritis, neuropathy, and other ailments. DOR Siddam, the evaluating physical therapist, noted that the patient was confused during the evaluation and she could not obtain all the needed information from the patient.

175. Patient 19 was placed in the Ultra High RUG (RU) level upon admission to Pawling. He was scheduled for occupational therapy 6 times a week, physical therapy 6 times a week, and speech therapy 5 times a week, for a total of at least 720 minutes of skilled therapy services per week. However, from the onset of therapy, it was apparent that he could not tolerate the therapy he was scheduled to receive. Numerous treatment notes and other documents show that Patient was too fatigued, confused and lethargic to complete the assigned schedule. He often fell asleep during the therapy sessions.

176. Patient 19 was discharged to the hospital on or about October 27, 2017. On November 9, 2017, the patient was readmitted to skilled therapy services at Pawling as a Medicare Part A patient following the hospital stay. He received treatment for unspecified altered mental status and difficulty in walking. The patient was placed in the Very High RUG (RV) level. However, it was apparent that he could not tolerate the therapy he was scheduled to receive. On many occasions, therapists noted that he was either too fatigued for scheduled therapy sessions, or actively refused to participate.

177. On December 21, 2017, the patient was re-admitted again to skilled services as a Medicare Part A patient. DOR Siddam asked Relator Rosenberger to try to admit the patient to speech therapy again this time. Relator Rosenberger attempted to evaluate the patient but he did not want speech therapy. Relator Rosenberger reported this to DOR Siddam but she insisted that they keep trying. DOR Siddam offered to go with the Relator to see the patient because she wanted the patient to be picked up for physical therapy too. DOR Siddam pushed the patient telling him, "Let's try for a week," and finally convinced the patient to agree to therapy.

178. When the DOR walked away, the patient told Relator Rosenberger that he felt death coming. When Relator Rosenberger went in later to evaluate the patient, she saw that he was hallucinating and nursing reported he had a UTI. Relator Rosenberger told the DOR that she could not assess cognition when someone has a UTI as it causes significantly increased confusion. She did not pick up the patient for speech therapy services.

179. The patient was picked up for physical therapy. The Projections chart shows that the patient could not tolerate any therapy on December 21 and 22. The patient received 30 minutes of physical therapy on December 23.

180. The patient passed away on December 26, 2017.

181. Based on the patient's symptoms, Relators Rosenberger and Retig opine that the patient could not tolerate the therapy. The Relators observed that Patient 19 was generally confused, tired, and vehemently refused to participate in therapy. The only reason that he was forced into therapy session was to generate improper Medicare billings for Defendants.

**Patient Twenty**

182. On January 15, 2018, 88-year-old Patient 20 was admitted to skilled therapy services at Pawling as a Medicare Part A patient following a hospital stay. She had received

treatment for acute and chronic respiratory failure, acute pulmonary manifestations due to radiation, malignant neoplasm of bronchus or lung, and muscle weakness.

183.    Her medical history included: lung cancer, chronic obstructive pulmonary disease, acute and chronic respiratory failure, and numerous other ailments.

184.    Patient 20 was placed in RU upon admission to Pawling.  She was scheduled for occupational therapy 5-6 times a week and physical therapy 5-6 times a week, for a total of at least 720 minutes of skilled therapy services per week.  However, from the onset of therapy, it was apparent that she could not tolerate the therapy she was scheduled to receive.  Numerous treatment notes and other documents show that she was in too much pain, often unable to breathe, and otherwise unable to participate in therapy sessions.

185.    Based on the patient's symptoms, Relator Retig opines that Patient 20 could not tolerate the therapy she received and the text messages between the therapists support this conclusion.  The only reason that she was forced into therapy session was to generate improper Medicare billings for Defendants.

**Patient Twenty-one**

186.    On October 24, 2017, 73-year-old Patient 21 was admitted to skilled therapy services at Pawling as a Medicare Part A patient following a hospital stay.

187.    His medical history included: lymphoma, C. diff. colitis, pancytopenia related to chemotherapy, malnutrition, sepsis and septic shock, metabolic acidosis, cachexia, stage 4 renal failure, hypertension, hypothyroidism, severe hypoalbuminemia, anemia, and dehydration.

188.    The patient was placed in RU upon admission to Pawling.  He was scheduled to receive occupational therapy 5-6 times a week and physical therapy 5-6 times a week, for a total of at least 720 minutes of skilled therapy services per week.  However, from the onset of therapy,

it was apparent that he could not tolerate the therapy he was scheduled to receive due to fatigue. In one case, he became unconscious during a therapy session, and the staff called 911 for assistance.

189. Based on the patient's documented status, Relators Rosenberger and Retig opine that Patient 21 could not tolerate the therapy. This patient appeared to be medically unstable based on the notes. His blood pressure was not controlled and, as such, he was unable to safely participate or tolerate therapy. He was not a good candidate for therapy, much less the high of minutes required to meet the RU level. The only reason that he was forced into therapy sessions was to generate improper Medicare billings for Defendants.

**Patient Twenty-Two**

190. On August 13, 2017, 67-year-old Patient 22 was admitted to skilled therapy services at Pawling as a Medicare Part A patient following a hospital stay.

191. His medical history included: pneumonia, chronic post-traumatic stress disorder, neuritis of the ulnar nerve, metabolic encephalopathy, and many other ailments.

192. The patient was placed in RU upon admission to Pawling. He was scheduled to receive occupational therapy 5-6 times a week, physical therapy 5-6 times a week, and speech therapy 4-5 times a week, for a total of at least 720 minutes of skilled therapy services per week. However, from the onset of therapy, it was apparent that the patient could not tolerate the therapy he was scheduled to receive. Numerous treatment notes and other records indicate that Patient 22 was unable and unwilling to participate in scheduled therapy sessions. Nevertheless, on August 25, 2017, DOR Siddam sent the following text message to the Pawling group chat stating: "[Patient 22] ARD is today. It's critical we get our time please. Someone tell Michelle or gina [sic] whoever has him. Thanks."

193. On September 6, 2017, Relator Rosenberger sent the following text message to DOR Siddam on the Pawling group chat: "Hi Divya, can you decrease minutes for [Patient 22]? He will barely eat or participate and 50 minutes is very difficult with him." DOR Siddam replied: Stacey [Patient 22]- I'm trying to give you a decent caseload and that's why he's 50 for you. I can decrease his minutes next week for speech." Relator Rosenberger replied: "Okay Divya, I only got 30 min for him today. I tried working with him multiple times, but he barely participates despite max attempts." The patient could only tolerate 30 minutes of the 50 minutes of scheduled speech therapy on September 6.

194. On September 8, 2017, Relator Rosenberger sent the following text message to DOR Siddam on the Pawling group chat: "Hi Divya, I will continue to attempt with [Patient 22] today but he is refusing any food." Later she sent DOR Siddam another text message about the patient stating: "Hi Divya, attempted multiple times with [Patient 22]. Minimal compliance. I can put 30 for him." Maria Tiernan, PTA, responded to this text message, adding: "[Patient 22] was up at 8am Angelia would not let me take him because he was not medicated. Went back 45 min later he still was not medicated. She started yelling saying we should them a list. Now he is bed and refusing." The physical and occupational therapy providers billed for no therapy on September 8, 2017 although each was scheduled to render 65 minutes of therapy, and the Relator Rosenberger billed for only 30 of the 45 minutes of scheduled speech therapy.

195. Management continued to pressure therapists to provide medically unnecessary sessions to Patient 22 on many occasions until he was discharged to another facility on September 13, 2017.

196. Based on the patient's symptoms, Relators opine that Patient 22 could not tolerate the therapy. His minutes were scheduled to meet the RUG level and the therapist's scheduled

hours, not based on medical necessity. The only reason that he was forced into such long therapy sessions was to generate improper Medicare billings for Defendants.

**Patient Twenty-three**

197. On January 1, 2018, 79-year-old Patient 23 was admitted to skilled therapy services at Pawling as a Medicare Part A patient following a hospital stay.

198. Her medical history included: unspecified dementia without behavioral disturbance, Parkinson's disease, fracture of right lower leg, atrial fibrillation, coagulation defect, chronic obstructive pulmonary disease, essential hypertension, hypothyroidism, anxiety disorder, and many other ailments. The patient was oxygen dependent.

199. The patient was placed in RU upon admission to Pawling. She was scheduled to receive occupational therapy 5-6 times a week, physical therapy 5-6 times a week, and speech therapy 5 times a week, for a total of at least 720 minutes of skilled therapy services per week. However, from the onset of therapy, it was apparent that she could not tolerate the therapy sessions that she was scheduled to receive. She frequently complained of fatigue and illness, and finally she was sent back to the hospital in respiratory distress.

200. Based on the patient's symptoms, Relators opine that the patient could not tolerate the therapy. She had respiratory issues, was often fatigued, and could barely move due to her condition. In Relators' professional opinion, the patient was not able to benefit from therapy. The only reason that she was assigned to the Ultra High RUG level was to generate improper Medicare billings for Defendants.

**Patient Twenty-four**

201. On October 31, 2017, 73-year-old Patient 24 was admitted to skilled therapy services at Pawling as a Medicare Part A patient following a hospital stay.

202. Her medical history included: breast cancer with brain metastasis, dementia, encephalopathy, delirium, malnutrition, volume depletion, hypertension, hyperthyroidism, hypernatremia, hypokalemia, and GERD.

203. The patient was placed in RU upon admission to Pawling. She was scheduled for occupational therapy 5-6 times a week and physical therapy 5-6 times a week, for a total of at least 720 minutes of skilled therapy services per week. However, from the onset of therapy, it was apparent that she could not tolerate the therapy she was scheduled to receive. She refused to participate on many occasions and reported extreme pain and discomfort. On November 30, 2017, when Patient 24 experienced extreme and could not tolerate the physical therapy session, DOR Siddam instructed the therapists to bill for the full time scheduled. *See* paragraphs 134-35 herein for more information on the patient's condition.[16]

204. Based on the patient's symptoms, Relators Rosenberger and Retig opine that the patient could not tolerate the therapy. They observed that this patient was very confused and tired. She had difficulty following directions and was resistant to participating in therapy. She slowly declined and eventually passed away. The only reason that she was assigned to the Ultra High RUG level was to generate improper Medicare billings for Defendants.

**Patient Twenty-five**

205. On February 15, 2018, 70-year-old Patient 25 was admitted to skilled therapy services at Pawling as a Medicare Part A patient following a hospital stay. He received treatment for disorder of circulatory system.

---

[16] Patient examples 14 and 24 refer to the same patient.

206. His medical history included: other disorder of circulatory system, end stage renal disease, dependence on renal dialysis, atherosclerotic heart disease and chest pain, among other ailments.

207. The patient was placed in RU upon admission to Pawling. He was scheduled for occupational therapy 5-6 times a week and physical therapy 5-6 times a week, for a total of at least 720 minutes of skilled therapy services per week. However, from the onset of therapy, it was apparent that he could not tolerate the therapy he was scheduled to receive. He was short of breath, dizzy and tired during his sessions, and had low blood pressure.

208. Based on the patient's documented status, Relators Rosenberger and Retig opine that the patient could not tolerate the therapy. His low blood pressure caused dizziness and prevented him from participating in therapy. The only reason that he was assigned to the Ultra High RUG level was to generate improper Medicare billings for Defendants.

**Patient Twenty-six**

209. On October 21, 2017, 94 year- old Patient 26 was admitted to skilled therapy services at Pawling as a Medicare Part A patient following a hospital stay. She had received treatment for epigastric pain and was diagnosed with acute reversible ischemia large intestine.

210. Her medical history included: small bowel obstruction in the distal ileum, diabetes mellitus, hypertensive disorder, anemia, GI bleed, ARF, chronic kidney disease, hypercholesterolemia, gout, heart failure, hyperlipidemia, renal impairment, hearing loss, asthenia, pneumatosis coli, and possible ischemic bowel.

211. The patient was placed in RU upon admission to Pawling. She was scheduled to receive occupational therapy 6 times a week and physical therapy 6 times a week, for a total of at least 720 minutes of skilled therapy services per week.

212. She was discharged to the hospital on November 3, 2017. The occupational therapy Discharge Summary notes that the patient had stated: "I am vomiting and I don't feel well."

213. The patient was readmitted to skilled therapy services at Pawling on November 8, 2017 and was again placed on RU. From the onset of therapy, it was apparent that she could not tolerate the level of therapy she was scheduled to receive. Numerous treatment notes show that she was fatigued, unable to breathe and nauseous. Nevertheless she was subjected to long therapy sessions. Pawling management even forced her to endure longer-than-scheduled sessions when she failed to complete an earlier session.

214. Based on Patient 26's documented status, Relators Rosenberger and Retig opine that the patient could not tolerate the therapy. She should not have been scheduled for such unattainably high minutes. The only reason that Patient 26 was assigned to the Ultra High RUG level was to generate improper Medicare billings for Defendants.

**Patient Twenty-seven**

215. On August 17, 2017, 64-year-old Patient 27 was admitted to skilled therapy services at Pawling as a Medicare Part A patient following a hospital stay. She was found unresponsive and foaming at the mouth on July 16, 2017. She received treatment for acute respiratory failure with hypoxia.

216. Her medical history included: aspiration pneumonia, acute kidney failure, depression, chronic pain, spinal stenosis, diabetes mellitus (DM) type 2, hypertension, morbid obesity, and right eye pain and hemorrhage.

217. The patient was placed in RV upon admission to Pawling. She was scheduled for occupational therapy 5-6 times a week, physical therapy 3-5 times a week, and speech therapy 4-

5 times a week. However, from the onset of therapy, it was apparent that she could not tolerate the therapy she was scheduled to receive. She was heavily medicated and often unresponsive to the therapists.

218. On August 18, 2017 Relator Rosenberger sent a text message to the Pawling group chat notifying the therapists that the patient was sent to the hospital. She later sent an update stating: "[Patient 27] is back but really not alert or able to participate with me. I will try again later. She will barely open her eyes though and is easily agitated." Amanda Knapp, Occupational Therapist, added: "Div she is heavily medicated. They are working on medication regulations. I spoke to Avery about md hold till they can get that under control. Today I can bill for only 15 minutes." Relator Rosenberger replied: "Same here, i [sic] can bill 15." DOR Siddam replied: "Ok whatever you can get. Please write a TEN [treatment encounter note]." The Projections chart shows that the patient tolerated only 15 of the 60 scheduled minutes of occupational therapy, 15 of 45 minutes of speech therapy, and no physical therapy on this date.

219. On August 21, 2017, Relator Rosenberger sent the following text message to the Pawling group chat: "Hi Divya, i was told that [Patient 27] was up all night and nursing told me if she is sleeping not to attempt to wake her up as she is agitated very easily and was screaming all night." DOR Siddam replied: "See her after lunch but she has to be seen. Tell nursing that insurance will not pay us if she's not seen." Relator Rosenberger replied: "I am with her now. Her oxygen is low and she is wheezing, nursing is here but i was only with her for 15, will try again late[r]." DOR Siddam replied: "Please try again." Relator Rosenberger responded: "Okay i will."

220. On August 23, 2017, Relator Rosenberger sent a text message to DOR Siddam about the patient on the Pawling group chat. She wrote: "[Patient 27] is out of it and isnt [sic]

staying awake." The DOR responded: "Isn't she only for 15 minutes?? Please see her." Relator Rosenberger replied: "40 minutes." The DOR replied: "Ok if you can't get all can pt or ot do 20? You can do 20 so that we have 40. Please she needs the 40. Check with ot or pt." Relator Rosenberger then stated: "Sure i [sic] can def get 20." The DOR replied: "Yes but i need the remaining 20 make sure someone is seeing her for those 20."

221. On August 23, 2017, the physical therapy Treatment Encounter Note states: "Unable to arouse pt. Nursing states pt was awake all night screaming. Pt care giver ed with husband…pt [patient] slept through all tx." Despite this, and per DOR Siddam's instructions, Maria Tiernan, PTA, billed for 20 minutes of physical therapy although the patient was not scheduled to receive physical therapy that day.

222. The patient was discharged to the hospital on August 23, 2017. The Nursing Note states: "Resident stated she wanted to kill herself. She started to bite her fingers. Continued screaming…sent out for her safety." The physical therapy Discharge Summary states: "Patient has no progress. Px [patient] is somewhat lethargic most of time, with behavioral disturbances and confusion. D/c [discharge] to hospital for further medical tx [therapy]".

223. Relator Rosenberger observed that Patient 27 was usually screaming and very agitated. Relator once observed Gina Bergdall, COTA, brush the patient's hair while the patient was half asleep, in order to bill Medicare for therapy. Ms. Bergdall was not providing any direction to the patient and was performing a task that the certified nurse assistants (CNAs) could do. Relator Rosenberger continued to tell DOR Siddam that the patient could not tolerate all the minutes of therapy that she was scheduled to receive, but was instructed to co-treat with occupational therapy in order to complete the scheduled sessions. The only reason that Patient

27 was put on such an inappropriate schedule was to generate improper Medicare billings for Defendants.

### D. Creating lists of Medicare Part B and Medicaid patients to pick up for therapy during the CMI cycles in order to increase the facility's Case Mix score and reimbursement levels

224. Defendants provide medically unnecessary therapy services to Medicare Part B and Medicaid patients in order to inflate the facility's CMI score and increase reimbursements. New York Medicaid reimbursement is based on the CMI score, which is based in part on the skilled therapy services rendered at the facility. *See* chart on page 31. Essentially, the more therapy services are provided to the facility's patients, the more resources the facility needs, and the higher the CMI score. Defendants have procedures set in place to ensure that therapists pick up patients for skilled therapy services during the CMI cycles so that the facilities generate the highest CMI score possible.

225. Defendants' management creates lists of Medicare Part B and Medicaid patients to be picked up during the CMI cycles in order to increase the facilities' Case Mix score and increase reimbursements. The list is used by the DORs to plan patient screens and evaluations. It is circulated to the nursing departments so that the nurses can start documenting a decline in the patient's condition in order to justify the therapy screen/evaluations. The CMI list includes the patient's name, planned ARD dates, the date the nurse should enter his/her notes in the system, the date when the referral from nursing is sent to the therapist, and the reason justifying the therapy. A CMI meeting is held twice a year (on or about April and October) at the Pawling facility where the DOR tells the therapist which patients on the list need to be picked up after nursing has created a paper-trail of their decline. Therapists are pressured by management and expected to put these patients on program despite their clinical judgment.

226.    Relator Rosenberger started working at Pawling during the CMI cycle so she received a copy of the April-July 2017 CMI list from DOR Siddam by email in June 2017. The CMI list is labeled "The Grand Rehab & Healthcare" and is dated May 9, 2017. The patients highlighted in yellow are the ones that need to be picked up for therapy. In an email dated June 6, 2017, DOR Siddam wrote: "Referrals due are highlighted. Bobby, pls [sic] check [G.D.]'s ARD if it's ok." Also copied on this email were Maximo Simbulan (upper management[17]), Geraldine Lawrence (Nurse Manager at Pawling), Avery Wiltse (Nurse Manager at Pawling), Rachel Andrew (Nurse Manager at Pawling), Ronisha White (Nurse Manager at Pawling), Carla Jane Camp (Director of Nursing), Rebecca DeLaRosa (Assistant Director of Nursing), and A. Burton (Dietician).

227.    Relator Retig was able to access the CMI lists for August - November 2018 and March 2019 under the "CMI Tracker" folder on one of the laptops at the Pawling facility used by therapists for patient documentation. Therapists use a shared password to log into the laptops. This folder is on the desktop.

228.    The effect of this list is that the same patients are recycled into therapy for financial gain rather than patient care. Patients are picked up for at least one week of therapy (about 30 minutes a day for five consecutive days[18]) multiple times a year, with goals that they cannot clinically attain. For example, a patient would require *maximal* assistance for dressing tasks and *maximal* encouragement the last time he was discharged. He was not making gains, refused to participate, and had achieved maximum potential. Even though his status did not

---

[17] Relators do not know his exact title, but believe he worked at the corporate office in Queens.
[18] If patients were only able to tolerate 15 minutes on a given day, the therapists had to render the missed 15 minutes another day during the 5-day period, in addition to the other scheduled minutes.

change, the next cycle he picked up for therapy with goals that are higher than his baseline; his prior baseline status is manipulated to state that he required *moderate* assistance for dressing tasks and the goal this time around is to achieve *minimal* assistance for dressing tasks. The patient again requires maximal cues for encouragement, is not making progress, and refuses to participate. This type of patient does not need therapy.

229. Relator Retig recalls a conversation she had with Barbara,[19] nurse on Floor 1 Unit 300 at Pawling, about patient E.S. on June 28, 2019. Relator Retig went to tell the nurse that the patient was having pain and refusing therapy. The nurse stated she was already aware and showed Relator Retig the CMI list which showed that patient's nursing note was due that day. She added: "I'm not going to sign anything that's false, they got the wrong nurse for that." Relator Retig asked why she would have to do that. The nurse responded: "It's all about the money. They are going to put everyone on and get every penny they can, that's how they make their money. They put people without limbs on, for what? Gait training? Come on! What kind of therapy are they doing? It's about the money." The nurse also said that she had attended a meeting with the DOR and another person, whose name she did not specify, about what nurses need to document in the system to justify screens/evaluations by therapists. She said documentation is more frequent now that CMI is continuous and not a cycle every three months.

230. Rick Bucalo, PTA, was also scheduled to treat the same patient E.S. that day. While discussing the patient's refusal with Relator Retig, Mr. Bucalo commented: "We have to check with DOR to see if it's okay to miss him. I don't think he has his ARD today, they need to

---

[19] Relators do not know Barbara's last name.

FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **69** of **98**

get 5 days in a row to get the score." Relator Retig asked what happens if they don't get the score and Mr. Bucalo responded: "They don't get money for them, they need 5 days in a row."

231. That day, Relator Retig also asked Janet Coughlin, COTA, why patient E.S. is on therapy. Ms. Coughlin replied: "For money…You know the OTRs make stuff up and lie." Relator Retig asked why and Ms. Coughlin explained that they are threatened and afraid they will lose their job. Ms. Coughlin explained: "They will say someone is a max assist when they are really a min assist, this is how they make their money. Patients are just recycled, it's case mix and it's continuous now instead of once every few months." Relator Retig said that there has to be an actual reason for therapy and Ms. Coughlin responded: "That's how it's supposed to be but that's not how it is, they make up reasons."

232. Relator Retig also recalls a conversation she had a conversation with Sonyam Kanojia, Physical Therapist, on June 28, 2019 about the CMI. Ms. Kanojia commented: "Ahh [L.M.] I don't want to put him on." Relator Retig asked her why the patient is on therapy and Ms. Kanojia said the reason is CMI. Relator Retig then asked: "Don't you have the option to say it's not appropriate?" Ms. Kanojia responded: "No, I'm told I have to pick people up, I have no say in it. I feel like I'm not using my license or judgment, I'm just told who to pick up. It's for money. These patients don't change, they make us make up reasons to put them on. All Larry does is scream, he doesn't participate, but I have to pick him up." She expressed that she doesn't know what to write in the evaluation report for someone who walks around independently but she has to pick up for therapy.

233. Ms. Kanojia also told Relator Retig that Rachel Andrew, a Nurse Manager who "does CMI," is resigning so the other nurses have to learn how to do it. She explained that DOR

Siddam gave the nurses templates of how to document a decline in function. She added: "It's all made up reasons just to get money".

234. On August 13, 2017, Relator Rosenberger had the following conversation with Alicia Lorr, former speech therapist at Pawling, via text message:

**Relator Rosenberger:** "I was wondering, was your caseload at the grand high only during casemix? My caseload is so low, was that typical for you? Thanks."

**Ms. Lorr:** "Yes that is why I left... They are not a facility that gets great potential speech patients."
...

**Relator Rosenberger:** "But wernt [sic] you guaranteed at least 6 hours? I was hired as a full time employee, so i stay my 6 hours lol."

**Ms. Lorr:** "Yes... But in time.....I was worried about productivity and them changing the deal."
...

**Relator Rosenberger:** "The CMI really is frustrating…this is coming again in october [sic] this CMI crap and i [sic] fear it because I [sic] like just saw probably all of those residents and they have all been on therapy so many times and it is just frustrating."

**Ms. Lorr:** "It's also a red flag to double dip…Meaning have the same people on for both CMIs…Corporate is horrible…. I was always taught [sic] that it is not good to double dip unless there was a significant change."
...

**Relator Rosenberger:** "There really never is a significant change, isnt is [sic] all set up for CMI?"

**Ms. Lorr:** "There has to be justification. And if you can't justify it....don't do it…Medicaid is really cracking down on the fraud…They know this is the game facilities are playing. And they want their money back…. And the grand is really getting bad with the fraud…Really bad."

235. Relator Rosenberger is not certain what Ms. Lorr means by "double-dip," but she understood it to mean that the facility admits the same patients in skilled therapy services during both CMI cycles in one year.

236. On November 6, 2017, Elizabeth Varghese, PTA, sent the following text message to the Pawling group chat about Medicare part B patient G.A.: "[G.A.] refused." DOR Siddam replied: "Need what ever [sic] you can get." The Treatment Log shows that Ms. Varghese billed for 31 minutes of physical therapy that day. On November 15, 2017, Ms. Varghese sent the following text message: "[G.A.] refused." DOR Siddam replied: "Please see her. Her cmi book is scheduled for tomorrow." The Treatment Log shows that Ms. Varghese billed for 30 minutes of physical therapy that day. This therapy was unjustified and scheduled solely to maximize billing to Medicare.

237. On November 20, 2017, DOR Siddam sent the following text message to Relator Rosenberger about Medicare Part B patient S.S.: "Can you put [S.S.] on program?" Relator Rosenberger replied: "There isnt [sic] anything to work on for goals. She isnt [sic] able to participate in swallow exercises due to cognitive status and cant [sic] remember compensatory strategies (i [sic] believe she is a feeder) she just had her swallow evaluation which recommended an upgrade but didnt [sic] recommend any therapy. I just upgraded her today." DOR Siddam replied: "Can we put her on for a week to see if she is safe in the new diet ?" Relator Rosenberger replied: "Thats [sic] the thing, the instrumental states she is safe and there is no aspiration, there arent [sic] any goals to work on. I wouldnt [sic] have any goals or justification to put her on…She is also declining and has been doing poor since yesterday, she didn't [sic] even get out of bed at all today and was sleeping most of the day." DOR Siddam persisted: "I don't want to cross boundaries but she could benefit even for 1 week for checking for safety." Relator Rosenberger responded: "Safety of what though? She is a feeder. Its [sic] documented that there is no aspiration. The test she went for checks safety on that diet. its [sic] not even anything that i could bill for. I dont [sic] have even any areas to work on. Like i [sic]

literally would have nothing to write to justify a service." DOR Siddam replied: "Ok I understand. Thanks" Relator Rosenberger did not pick up the patient for speech therapy services. The patient was however picked up for occupational therapy on November 27, 2017, and was discharged on December 1, 2017, after receiving 30 minutes of therapy for five consecutive days. Relator Rosenberger believes that the patient passed away shortly thereafter.

238. Relator Rosenberger recalls a confrontation she had with DOR Siddam in or about October or November 2017. Relator Rosenberger refused to pick up patients who did not need therapy just because they were on the CMI list. DOR Siddam communicated this to Katy O'Conner, Chief Reimbursement Officer, who responded with something to the effect of: "This is how the game works. That's what facilities do. She will learn the hard way that she needs to maintain a caseload." Relator Rosenberger understood Ms. O'Conner's response to mean that she would be fired if she did not participate in the wrongful practices.

239. Relator Rosenberger also recalls another instance when DOR Siddam pressured her to pick up a patient for speech therapy and instructed her to manipulate the patient's status to justify the therapy. She told DOR Siddam that the patient was already drinking thin liquids and had not had any difficulties with it. DOR Siddam told Relator Rosenberger to pick up the patient anyway and state that the patient is drinking nectar thick liquids (a more restrictive level) and work towards getting the patient to thin liquids. This was during Relator Rosenberger's first CMI cycle at Pawling in April 2018.

240. On January 24, 2018, DOR Siddam told Relator Retig: "There's some people I definitely want you to see for the full time. I totally forgot to tell you…[S.T.], need the minutes." Relator Retig explained that Medicaid patient S.T. was sleeping and her attempts to get him up were unsuccessful. DOR Siddam replied: "It's about dinner time, maybe you could try to feed

him because he's on the priority list. Also C.S. priority." Relator Retig told DOR Siddam that she would try again but wasn't sure if the patient would participate. She explained that he wasn't doing well the other day when she treated him and he barely participated. Yosef Spierer, Pawling Administrator, was present during this conversation. Amanda Knapp, occupational therapist, told Relator Retig to bill for the time she spent attempting to get the patient to engage in therapy that day, but Relator Retig did not bill any minutes. The Projections show that the patient received 40/40, 30/30, and 30/30 minutes of occupational therapy on January 25-27, 2018, respectively. This therapy was unjustified and scheduled solely to maximize billing to Medicaid.

241. Relator Retig was scheduled to treat patient S.T. again on January 29, 2018, but again he refused. Relator Retig sent the following text message to DOR Siddam: "…[S.T.] refused." DOR Siddam replied: "Need Thorne please. At least 20 for cmi." Relator Retig replied: "He won't even wake up … he won't eat … his eyes are closed. I'll try again but he is not verbally responding to me." Relator Retig did not bill for occupational therapy that day. The patient passed away on February 1, 2018.

242. On February 26, 2018, Rick Bucalo, PTA who was covering for DOR Siddam while she was on vacation, approached Relator Rosenberger and said: "I was thinking about you yesterday and I am really worried. I hope you have a back up plan." Relator Rosenberger responded: "You mean in regards to my job? I don't know, I'm stressed out because I think they will let me go. My caseload is low." Mr. Bucalo responded: "I think Divya just wants you to play the game so that you can keep your job." Relator Rosenberger responded: "I can't make up reasons to put people on therapy. There is not anything I can do. We don't have people who

need speech therapy right now; hardly any of the new admissions need speech services. I can't just put people on for no reason." Mr. Bucalo responded: "I understand."

243. On September 11, 2017, Amanda Knapp, Occupational Therapist, sent the following text message to the Pawling group chat about a referral she received from the nursing department to screen Medicare Part B patient G.L. She wrote: "Divya you have to step in and help us deal with this ridiculous screen to put [G.L.] BACK on program ADL retraining. This is the 2nd screen and liz [sic] answered the first one and talked to Yosef...." Liz Noonan, occupational therapist, joined the conversation and replied: "I went to see to yosph [sic] And [sic] told him to just stop with the decline talk... I don't want nurses telling me my job I don't tell them there's [sic] and I told him that Ronisha [White, nurse at Pawling] didn't even know [G.L.] was on therapy and she wrote the screen." The therapists did not think the patient was an appropriate candidate for therapy but were being pressured from the facility to admit the patient to skilled therapy services.

244. On December 18, 2017, DOR Siddam sent the following text message to the Pawling group chat about Medicare Part B patient L.C.: "Amanda and Pinky you didn't put [L.C.] on?" Pinky Buque, physical therapist, replied: "Good morning div [sic], we did not put [L.C.] on. She is supervision with rollator." DOR Siddam replied: "Oh ok. Not even a week??" Ms. Buque replied: "Okay div [sic]...We can re eval her." The patient was picked up for physical therapy but not for occupational therapy by Amanda Knapp.

245. Relator Retig recalls a conversation she had with Valerie Pollard, a nurse at Pawling, on June 7, 2018. Ms. Pollard commented: "I'm getting so sick of this place. It's too much." She said that she is starting a new job in a few months and added: "They are going get in trouble for Medicare fraud and I don't want to be here when it goes down."

246.    Also on June 7, 2018, Relator Retig sent the following text message to DOR Siddam about Medicare Part B patient J.B.: "[J.B.] said she has been waiting all day for Janet and does not want to do therapy this late." DOR Siddam replied: "Please try to do some bedside and get the mins. She's on for CMI." Relator Retig replied: "I'll try again I told her we would do at bedside but she said no but I'll ty again." DOR Siddam replied: "Please. Thanks…I just checked and her ard is today. We need the minutes." Relator Retig replied: "Going in a few and will try again." Relator Retig was able to render 30 minutes of occupational therapy after multiple tries.

247.    On January 28, 2019, Angela Parodi, Acting DOR, sent the following text message to Relator Retig about her Medicare Part B patient minutes: "You are showing up on a report for missed revenue. You billed 35/30 minutes for [patient C.] on 1/21. Can you make it 30/32 minutes so that it doesn't show up as missed revenue. For Part B they calculate it by minutes and what is [sic] says is that 'you are 3 minutes away from the next unit' so it counts it as missed revenue. If you can change it between 30-34 minutes that would be great… If you can do it now that would be great. I have to send up a report to Corp." Relator Retig wrote: "Can I get in trouble for that? Adjusting my billing? … or just procedure? Just nervous cuz [sic] I already e- signed." Ms. Parodi replied: "You are not going to get in trouble. The month isn't finalized. I'm not having you bill the next unit. It's within the same unit. 1 unit is 8-22 minutes 2 units is 23-37 minutes 3 units is 38-52 minutes You fell in two unit range but the report says, 'Well for 3 more minutes you can bill the next unit' but I'm not asking you to do that."

248.    Relator Rosenberger recalls that Yosef Spierer, Administrator at Pawling, approached her while she worked at the facility and asked if she could find a reason to put

patients on for speech therapy. According to his LinkedIn profile, Mr. Spierer has a degree in Business Administration and Digital Marketing; he does not have a medical background.

Patient Examples

249. By way of illustration, the following are examples of Medicare Part B patients from the Pawling facility who were picked up for therapy at the instruction of Defendants during the CMI cycles even though they did not need therapy.

**Patient Twenty-Eight**

250. In November 2017, 93-year-old Managed Medicare Part A Patient 28 was discharged from occupational therapy services at Pawling. According to the *Functional Skills / Outcomes* section of the Discharge Summary, at the time of discharge, the patient required ***maximum assistance*** with bathing (both upper and lower body), toileting, and upper and lower body dressing. The Treatment Encounter Notes state that the patient was resistant to activities and required a lot of encouragement to participate in therapy. The Discharge Summary states that the patient had achieved maximum potential and was referred to a Functional Maintenance Program (FMP).

251. The patient was re-evaluated and re-admitted to occupational therapy in May 2018 as a Medicare Part B patient. He resided at the facility and had not received therapy services since November 2017. The Evaluation and Plan of Treatment lists the patient's *prior* level of function as requiring ***moderate assistance*** with bathing, toileting, and upper/lower body dressing. This is false – the patient required maximum assistance with all these tasks when he was discharged in November 2017.

252. The May 2018 Evaluation states that the patient was referred to therapy because he experienced a decline with his ADLs and ability to self-care. It lists the patient's *current* level

as requiring *maximum assistance* with bathing and dressing, and total dependence with toileting. This is the level at which the patient was discharged in November 2017. The occupational therapy goals for May 2018 were for the patient to perform bathing and dressing tasks with minimum assistance, and toileting with moderate assistance. He had not experienced a decline since his last stay, contrary to what the May 2018 Evaluation states.

253.    Patient 28 will not be able to perform these tasks with minimum/moderate assistance because he had achieved maximum potential when he was discharged in November 2017 requiring maximum assistance. When he was re-admitted, Defendants set his goals at a higher level without regard to the patient's ability to meet them solely to increase their billings to Medicare.

**Patient Twenty-Nine**

254.    In November 2017, 99-year-old Medicare Part B Patient 29 was discharged from occupational therapy services at Pawling. One of the goals of therapy had been to complete hygiene/grooming tasks with minimum assistance. According to the *Functional Skills / Outcomes* section of the Discharge Summary, at the time of discharge, the patient required *maximum assistance* with hygiene/grooming and upper body dressing, and *total dependence* with bathing (both upper and lower body), toileting, and lower body dressing. The Discharge Summary states that the patient had achieved the highest practical level.

255.    Patient 29 was re-evaluated and re-admitted to occupational therapy in May 2018 as a Medicare Part B patient. She resided at the facility and had not received therapy services since November 2017. The Evaluation and Plan of Treatment lists the patient's *prior* level of function as requiring *contact guard assistance* with hygiene/grooming and *moderate assistance*

with bathing. This is false – the patient required maximum assistance with hygiene/grooming and total dependence with bathing when she was discharged in November 2017.

256. The May 2018 Evaluation states that the patient was referred to therapy for feeding. It lists the patient's *current* level as requiring ***moderate assistance*** with hygiene/grooming and maximum assistance with bathing. The occupational therapy goals for May 2018 were for the patient to perform grooming tasks with ***minimal assistance*** and to complete stand-pivot-transfer (SPT) from bed/chair to wheelchair with maximum assistance. The grooming goals were set much higher than the patient could achieve considering the patient's true level at her last discharge. In addition, no goals were set to improve/maintain patient's feeding level. Defendants provided therapy for Patient 29 solely to increase their Medicare billings, not to benefit the patient.

257. On May 9, 2018, Relator Retig discussed this patient with Janet Coughlin, COTA. Relator Retig asked Ms. Coughlin why a specific patient that she was scheduled to treat was on therapy and Ms. Coughlin responded: "They put the same people on for CMI all the time. They make up reasons to put people on in order to get money from Medicare." She added that she has 100-year-old Patient 29 on therapy for feeding, even though there was no change in the patient's condition. Ms. Coughlin stated: "They told Angela [Tomkins, occupational therapist] to find something to put her on for." Ms. Coughlin asked Relator Retig not to repeat this information.

### E. Establishing 90% + daily productivity requirements for therapists and therapy assistants

258. Defendants have established a company-wide mandate that physical and occupational therapists and therapy assistants must be at least 90% productive every day. Speech therapists do not have the same requirements because they have a lower caseload of

patients. "Productive" as used by Defendants means that from the moment the therapists and therapy assistants walk into the facility, they should be conducting Medicare billable treatments on patients. The productivity requirements are impossible to meet without billing Medicare for ancillary services not covered by Medicare.

259. The *Productivity and Efficiency By Site* report shows that, in 2017, physical therapists at Pawling were overall 95.6% productive and occupational therapists were overall 83.9% productive. From January to March 3, 2018, physical therapists at Pawling were overall 94.6% productive and occupational therapists were 86.1% productive. These statistics are strong evidence of fraud because this level of "productivity" can only be achieved by billing Medicare for activities that are not covered by Medicare.

260. The *KPI Site Trend Report* shows the monthly productivity by discipline from January 2016 to February 2018. The *Adjusted Productivity Report* shows each therapist's productivity by year from January 2016 to March 3, 2018. Anything less than 86% productive is flagged in red.

261. The typical work day for Defendants' therapists and therapy assistants is eight hours. Overtime is not allowed.[20] An 8-hour day is 480 minutes. 90% of 480 minutes is approximately 432 minutes of billable time. This leaves approximately 10% of the workday, or 48 minutes, of "non-productive" time. Generally, the therapists treat an average of 7-8 patients a day and draft reports for each patient they treat. At an average of 10 minutes per report, this equals at least 70 minutes a day. This already exceeds the "non-productive" time available to the therapists. There are also many ancillary tasks (non-billable time) which are required before and

---

[20] Text messages show that at one point therapists needed approval to work overtime but DOR Siddam discouraged it.

after the therapy sessions. The therapists must locate the patients, convince them to come to therapy, and then transport them from their rooms to the therapy area and back to their rooms.[21] The average round-trip time is ten minutes, so it takes at least 70 minutes per day to transport patients. Further, therapists wash their hands in between patients, talk to nursing staff about the patients, wait for the patients to be changed, and/or wait while another therapist or the doctor finishes up with the patient. All of this takes time.

262. Medicare reimburses SNFs only for the time spent on providing therapy to the patients. None of the ancillary tasks described above, and many others, are billable under Medicare regulations as skilled therapy services. However, it would be impossible to complete all these tasks and provide therapy to all the scheduled patients in a day within the eight hours allotted. Because therapists and therapy assistants wanted to meet the Defendants' productivity requirements, but lacked sufficient time to perform all these ancillary tasks, they reported most of these tasks on the billable time sheets and invoiced Medicare for ancillary tasks. They were instructed to bill for the time it takes them to convince the patients to come to therapy as "attempting and educating" the patients so it doesn't affect productivity and they can get the scheduled minutes. Relators have observed that therapists at Pawling spend about two hours a day performing ancillary tasks that they bill as skilled therapy time with the patients. The productivity requirements pressured the therapists to write progress reports when they should have been conducting therapy and to invoice Medicare for activities that are not reimbursable under the regulations.

---

[21] There are no rehab aides at Pawling.

FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **81** of **98**

263. Relator Retig works per-diem at Pawling so the facility does not usually pressure her about her productivity. However, Defendants' management still closely monitors it. On April 30, 2019, DOR Siddam sent Relator Retig the following text message: "Please watch your productivity. Regional wasn't happy about last week."

264. On or about August 25, 2019, DOR Siddam sent another text message to Relator Retig about her productivity the prior week. She wrote: "Also your productivity for ladies [sic] week is very low, 60%. We have to tighten this up from [sic] next time please. Expected for a COTA is 92%."

265. On August 20, 2019, Lauren Argo, COTA, was on one of the computers at the Pawling facility. Relator Retig was nearby. Ms. Argo commented something to the effect of: "Oh my productivity is only 86%." Relator Retig replied that that's not that bad and added that her productivity is usually lower. Ms. Argo responded that her productivity requirement is at least 93%.

266. Relator Retig recalls a conversation she had with Maria Tiernan, PTA about productivity. Ms. Tiernan was once a full-time employee but switched to working per-diem. Ms. Tiernan expressed her dislike for Pawling stating that Pawling is worse than her other job because the workers enable the fraud and the therapists just bill for patients they don't even see. Ms. Tiernan said that she attended a meeting where she was instructed to be 93% productive and to perform group therapy with patients in order to increase productivity.

267. Relator Retig also had a conversation with Rick Bucalo, PTA, about group therapy. Mr. Bucalo commented: "It's getting worse here." Relator Retig asked why and Mr. Bucalo said that they have to start doing group therapy. He added: "It's just another way for them to get us to commit fraud."

268.     On January 15, 2019, Relator Retig sent a text message to Angela Parodi, Acting DOR covering for Ms. Siddam, about three patients who refused to participate in therapy. Ms. Parodi responded: "Corporate is on high raider [sic] for productivity ... don't waste time on people you know you're not going to get."

### F.  Billing for unskilled services in order to meet the scheduled therapy minutes

269.     As mentioned in Section C above, patients often cannot tolerate all the therapy they are scheduled to receive and refuse to participate during the sessions. However, therapists are pressured to get all the minutes in order to meet the RUG levels and to meet their productivity targets. As such, they are forced to perform and bill for tasks that are not skilled because they could have been safely done by the CNAs or non-medical persons. The therapists are not providing direction, observing or evaluating the patient during these tasks because the patients are often asleep and not participating. *See, e.g.,* Patients 17 and 27 herein.

270.     As an additional example, Medicare Part A patient W.P. was on RU and his next checkpoint was on January 25, 2018. On January 23, 2018, he was scheduled to receive 65 minutes of physical therapy, 55 minutes of occupational therapy, and 35 minutes of speech therapy. However, he was sick that day and refused treatment. The physical and speech therapists did not bill for therapy that day. Relator Rosenberger saw occupational therapist Skip Baker sitting next to the patient while the patient was sleeping. Mr. Baker was not treating the patient. Despite this, the Treatment Log shows that Mr. Baker billed for the full 55 minutes of occupational therapy on January 23, 2018.

### G.  Purposefully delaying patient discharges

271.     When patients complete their course of therapy, the therapists recommend their discharge. In some cases, patients cannot tolerate the therapy and therapists recommend a

discharge to alleviate the patients' worsening conditions caused by physical exertion or participation in therapy. In other cases, patients have met their short-term therapy goals and are independent, or have reached a plateau in their progress and skilled therapy services are no longer medically necessary.

272. However, Defendants block and/or delay patient discharges to increase Medicare and Medicaid reimbursements. The timing of a patient's discharge from therapy is not decided by the patients' treating therapists, but by the facility as a whole and is based on financial reasons. Text messages show that therapists at Pawling informed the DOR that patients need to be discharged and she told them that she would discuss their recommendations with Yosef Spierer, the facility's administrator, and "the team." Relators do not know who the team is comprised of, but text messages indicate that DOR Siddam attended "UR meetings" where she discussed patients and made discharge decisions. On information and belief, "UR meetings" refers to Utilization Review meetings.

273. Therapists also made their discharge recommendations during the weekly rehab meeting with the DOR, which took place on different weekdays during lunchtime. Relator Rosenberger recalls DOR Siddam asking the therapists to continue therapy. For example, Relator Rosenberger recalls recommending that patient W.P. be discharged from speech therapy and DOR Siddam asked her to keep him on therapy for about another week. Relator Rosenberger did so despite her medical judgment.

274. On August 1, 2017, Liz Noonan, occupational therapist sent the following text message to the Pawling group chat: "Is [patient G.A.] ever going home[?]" Maria Tiernan, PTA, later sent the following text messages to the group chat: "I have [patient L.] today progress note was due yesterday. What is the plan?...[patient D] needs to have a DC plan...[patient W.] DC?...

[patient R] and [G.A.]. DC plans?" DOR Siddam replied: "I will discuss all these patients at ur today." A week later some of the patients were still on therapy so Ms. Tiernan sent the following text message to DOR Siddam on August 8, 2017: "[Patient D] is 1 with transfers and ambulation and steps. She needs to be DC d [Patient R] no progress made needs to come off." DOR Siddam responded: "Yes last day for us will be this Friday. Have her sign the cut letter…[Patient R] - today is her last day. I thought I said that yesterday to have her sign the cut letter."

275. On August 17, 2017, Relator Rosenberger sent the following text message to DOR Siddam: "Can I DC [discharge] [W.S.]? He barely eats and participates, he isnt [sic] going to make progress." DOR Siddam replied: "Can we wait until next week[?]" The patient was discharged from speech therapy on August 25, 2017.

276. On September 11, 2017, Maria Tiernan, PTA, sent the following text message to DOR Siddam about the same patient: "[W.S.] is actively dying. He needs to be DC d [sic]." DOR Siddam replied: "Oh. I will email the team." She later responded: "Last day 9/13, please have him sign the cut letter and just bill whatever you get for these 3 days…At least 15 for today to avoid private bill for him." Ms. Tiernan replied: "I will try. But I don't think he will be able." The patient passed away on September 12, 2017.

277. On August 18, 2017, Amanda Knapp, occupational therapist, sent the following text message to DOR Siddam on the Pawling group chat: "Also when can we d/c [Patient C.]. It is so hard to get the 75 minutes every day." DOR Siddam replied: "I will cut down his time." Ms. Knapp replied: "D/C date for [Patient C]?" DOR Siddam replied: "I have to check. We have low med a patients now. Have to talk to the team before I can dc him."

278. On September 7, 2017 Relator Rosenberger sent the following text message to DOR Siddam about Patient 22: "Hi Divya, [Patient 22]'s recert id due 09/10. He barely

participates and has not made progress so i'm [sic] not going to recertify him." DOR Siddam replied: "Can you make tomorrow his last day for you please. He needs minutes today and tomorrow." Relator Rosenberger replied: "Yes im [sic] seeing him today and tomorrow. His recert isnt [sic] due until 09/10." DOR Siddam replied: "Ok thanks. I just emailed mary [sic] about the plan." The patient could only tolerate 30/50 minutes of speech therapy on September 7th.

279. On September 21, 2017, Ms. Tiernan sent the following text message to DOR Siddam: "When is [D.K.] last day. She has meet all PT goals." DOR Siddam replied: "Yosef was supposed to get back to me about that. He was going to call dutchess [sic] care."

280. On January 19, 2018, Relator Rosenberger sent the following text message to DOR Siddam about Medicare Part B patient C.S.: "Divya can we do a cut letter for [C.S.], he refused again and doesn't want speech." DOR Siddam replied: "We can make 1/25 his last day but will need his time until 25th though. Can we get it[?]" Relator Rosenberger replied: "He isn't going to participate he told me he wants to 'call it off'  He refused today and the last 2 days. He is very upset about his decline with walking and isn't concerned about speech." The patient was discharged from speech therapy on January 22, 2018. The patient was picked up for occupational therapy on January 19, 2018, the same day Relator Rosenberger sent the text message. On January 24, 2018, DOR Siddam told Relator Retig this patient was "priority" for occupational therapy.

281. On November 20, 2017, Relator Rosenberger sent a text message to Erin Gilmore, SLP at River Valley, about the pressure she felt from DOR Siddam to pick up patients for therapy. Ms. Gilmore also worked as a PRN SLP at Pawling. Relator Rosenberger asked Ms. Gilmore if the DOR at River Valley pressured her to pick up patients and Ms. Gilmore

responded: "No she never does but sometimes I have to keep people on for longer than I want. If she [the DOR at River Valley] really needs them on service than I'll trial for 2 wks. I have a person on now that I shouldn't have picked up but I told her I'll trial. We have made no progress." Relator Rosenberger replied: "I have a LTC that i [sic] got an instrumental for. She isnt [sic] aspirating (has been on puree and nectar forever), but the instrumental shows no aspiration and recommended ground (didnt [sic] even recommend therapy), i [sic] just upgraded her to ground and thin since the test documents that, she is a feeder so I [sic] cant [sic] even train in any compensatory strategies and she cant [sic] to strengthening exercises And she kept pushing me to put her on for a week to capture the casemix score." Ms. Gilmore replied: "That's the only reason why....right now its [sic] all about casemix But it's annoying bc you have no goals."

### H. Billing evaluations as treatment time

282. Therapists report only a fixed amount of time - e.g., 15 minutes - as time spent on an initial evaluation, and then report, falsely, that any additional time spent on an initial evaluation was time spent providing therapy. These false reports are required by Defendants to increase Medicare and Medicaid billings.

283. At the Defendant SNFs, therapists are required to treat patients the same day they evaluate them, but they do not have an actual treatment session scheduled with the patients that day. According to Relator Rosenberger, evaluations take 30-80 minutes to complete, depending on the patient. Because there is not enough time allocated for both evaluation and treatment in their schedules, therapists report part of the time they spend evaluating and writing the *Plan of Treatment* report as actual treatment time. Relator Rosenberger, in speaking with other therapists, learned that this is standard practice among the therapists at Pawling.

284. The patients' Treatment Logs show how much time was billed for the each evaluation. As noted above, Medicare and Medicaid regulations prohibit the practice of counting the time spent on evaluation and developing treatment goals as minutes of therapy received by the beneficiary.

## VII. COMPANY-WIDE PRACTICES

285. The illegal practices described in this Complaint are implemented company-wide by Defendants' corporate management team to maximize Medicare and Medicaid billings in all of the defendant facilities. The Defendant SNFs use the same software system, Rehab Optima, for documenting therapy services. Utilizing one system means that Defendants' management closely monitors every aspect of the operations at all the Defendant SNFs and knows whether or not the company's mandates are being met. Text messages show that corporate monitors facilities' RUG levels (¶¶ 148-54), productivity (*Id.*, ¶¶ 259, 264), billing (¶ 157), and CMI score (¶¶ 231, 234). DORs are pressured to meet corporate mandates and have to provide an explanation for why the facility's patient population cannot tolerate high RUG levels or why the therapists cannot always be over 90% productive. *See* ¶¶ 148-51.

286. In addition, Relator Rosenberger's conversation with Erin Gilmore, described in paragraph 281 herein, shows that these practices are not limited to Pawling. The DOR at River Valley also pressures the facility's therapists to pick up patients and keep them on therapy longer than is medically necessary in order to meet metrics and increase reimbursements. Also, Relator Retig's conversation with Elizabeth Varghese about Claudia, the visiting DOR from Queens, shows that therapists at the Queens facility are also pressured to render medically unnecessary therapy. *See* paragraph 168 herein.

287. Furthermore, Defendants share employees and therapists from the different SNFs train each other. *See* paragraph 168 herein. Also, Relator Rosenberger was trained by Erin Gilmore, SLP at River Valley, when she first started working at Pawling; she shadowed Ms. Gilmore for a few days at the River Valley facility. In addition, Katy O'Conner, Chief Reimbursement Officer, and other high-level officers have visited the Pawling facility to monitor compliance with corporate policies.

## VIII.    PERIOD OF WRONGDOING

288. When she started her employment at Pawling in October 2016, Relator Retig observed that the Defendants were highly organized in the way they implemented the procedures to ensure that the mandates were met. Right away, patients were placed in the Ultra High RUG category, despite their inability to tolerate the therapy, and were kept in therapy, despite the therapists recommendations for discharge. This indicated to Relator Retig that the mandates were not recently implemented, but rather that Defendants has been engaging in these practices for a long time.

289. According to documents filed with the New York Department of Health, Jeremy Strauss has been the Executive Director of Pawling since 2003. The Grand's current website launched in 2014.

## IX.    FACTS RELATING TO RELATOR ROSENBERGER'S RETALIATION AND CONSTRUCTIVE DISCHARGE

290. As described throughout this Complaint, there were many instances where Relator Rosenberger and DOR Siddam did not see eye-to-eye about patient care and Relator Rosenberger refused to admit patients to speech therapy or to continue speech therapy on patients who, in her professional opinion, did not need it or could not tolerate it, despite DOR

Siddam's instructions to the contrary. *See*, e.g. paragraphs 141, 177-78, 193, 218-20, 237-38, 280 herein. Relator Rosenberger is a speech language pathologist while DOR Siddam is a physical therapist; the two are not in the same profession, yet DOR Siddam attempted to supersede Relator Rosenberger's clinical judgment by requiring her to follow Defendants' mandates and render medically unnecessary speech therapy services.

291. As a direct result of her refusal to participate in Defendants' mandates, Relator Rosenberger was terminated from her position at Pawling on April 19, 2018. She was told not to come in because there were not enough patients to support her position. This was a pretext because Defendant The Grand Rehabilitation And Nursing At Pawling posted an online advertisement for a SLP position on April 1, 2018. In other words, there was a need for a SLP at the facility, but Defendant sought to replace Relator Rosenberger due to her refusal to engage in the fraudulent practices. Relator Retig, who still works at the facility, observed that the facility hired a new SLP shortly after Relator Rosenberger's termination.

292. Relator Rosenberger knew that if she remained employed at The Grand Rehabilitation And Nursing At Pawling, she would have been forced to engage in behavior she thought was in violation of regulations and other legal requirements. As a result of retaliation against her for not engaging in Defendants' fraudulent practices, the Relator was forced to leave her employment in April 2019. The Relator was constructively discharged from her employment by Defendant The Grand Rehabilitation And Nursing At Pawling.

## COUNT I: FALSE OR FRAUDULENT CLAIMS
### (against all Defendants)
### 31 U.S.C. Sec. 3729(a)(1)(A)

293. The Relators repeat and re-allege each allegation in each of the preceding paragraphs as if fully set forth herein.

294. During the period 2014 to the present day, Defendants knowingly or in deliberate ignorance or reckless disregard of the truth presented or caused to be presented false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. Sec. 3729(a)(1)(A). Specifically, Defendants presented or caused the presentation of claims for payment to Medicare for therapy services that were unreasonable, unnecessary, unskilled, or that simply did not occur as the Defendants reported them to have occurred.

295. By virtue of the false or fraudulent claims Defendants knowingly presented or caused to be presented, the United States has suffered actual damages in an amount to be proven at trial. The United States is entitled to recover treble damages plus a civil monetary penalty for each and every false claim.

### COUNT II: FALSE STATEMENTS MATERIAL TO FALSE CLAIMS
**(against all Defendants)**
**31 U.S.C. Sec. 3729(a)(1)(B)**

296. The Relators repeat and re-allege each allegation in each of the preceding paragraphs as if fully set forth herein.

297. During the period 2014 to the present day, the Defendants knowingly or in deliberate ignorance or reckless disregard of the truth made, used or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of the False Claims Act, 31 U.S.C. Sec. 3729(a)(1)(B) and the certification noted in paragraph 77 herein.

298. Defendants falsely certified that the claims were for services that were rendered and/or necessary and reasonable. The government relied on those statements and paid the fraudulent invoices. The misrepresentations were material as the term is defined in the False Claims Act and interpreted by the courts.

299.    By virtue of the false records or statements Defendants made, used or caused to be made or used, the United States has suffered actual damages in an amount to be proven at trial. The United States is entitled to recover treble damages plus a civil monetary penalty for each and every false claim.

### COUNT III: REVERSE FALSE CLAIMS ACT
#### (against all Defendants)
#### 31 U.S.C. Sec. 3729(a)(1)(G)

300.    The Relators repeat and re-allege each allegation in each of the preceding paragraphs as if fully set forth herein.

301.    During the period 2014 to the present day, Defendants made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

302.    Such false records or statements or knowing concealment, avoidance or decrease of an obligation to pay or transmit money to the United States were made or done knowingly, as defined in 31 U.S.C. § 3729(b)(1). Failure to return any overpayment such as the claims on which Defendants received any overpayment from Medicare or Medicaid constitutes a reverse false claim under 31 U.S.C. § 3729(a)(1)(G) of the False Claims Act.

303.    By virtue of Defendants' conduct, the United States has suffered actual damages in an amount to be proven at trial. The United States is entitled to recover treble damages plus a civil monetary penalty for each and every false claim.

<u>**COUNT IV: RETALIATION AND CONSTRUCTIVE DISCHARGE V.**</u>
<u>**THE GRAND REHABILITATION AND NURSING AT PAWLING**</u>
**31 U.S.C. Sec 3730(h)**

304. The Relators repeat and re-allege each allegation in each of the preceding paragraphs as if fully set forth herein.

305. During the period of April 2017 to April 2018, Relator Stacey Rosenberger engaged in lawful acts and protected activity in furtherance of her efforts to stop more than one violations of the False Claims Act. On or about April 19, 2018, she was constructively terminated because she refused to participate in the fraudulent and illegal practices described herein.

306. As a direct and proximate result of this unlawful termination by Defendant The Grand Rehabilitation And Nursing At Pawling, Relator Rosenberger has suffered economic damages in an amount to be asserted at trial.

<u>**COUNT V: FALSE OR FRAUDULENT CLAIMS**</u>
**(against all Defendants)**
**NY State Finance Law, Art. XIII § 189(1)(a)**

307. The Relators repeat and re-allege each allegation in each of the preceding paragraphs as if fully set forth herein.

308. During the period 2014 to the present day, Defendants knowingly or in deliberate ignorance or reckless disregard of the truth presented or caused to be presented false or fraudulent claims for payment or approval in violation of the New York False Claims Act, State Finance Law, Art. XIII § 189(1)(a). Specifically, Defendants submitted claims for payment to the New York Medicaid for therapy services that were unreasonable, unnecessary, unskilled, or that simply did not occur as the Defendants reported them to have occurred.

309. By virtue of the false or fraudulent claims Defendants knowingly presented or caused to be presented, the State of New York has suffered actual damages in an amount to be proven at trial. The State of New York is entitled to recover treble damages plus a civil monetary penalty for each and every false claim.

## COUNT VI: FALSE STATEMENTS MATERIAL TO FALSE CLAIMS
### (against all Defendants)
### NY State Finance Law, Art. XIII § 189(1)(b)

310. The Relators repeat and re-allege each allegation in each of the preceding paragraphs as if fully set forth herein.

311. During the period 2014 to the present day, the Defendants knowingly or in deliberate ignorance or reckless disregard of the truth made, used or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of the New York False Claims Act, State Finance Law, Art. XIII § 189(1)(b).

312. Defendants falsely certified that the claims were for services that were rendered and/or necessary and reasonable. The State of New York relied on those statements and paid the fraudulent invoices. The misrepresentations were material as the term is defined in the New York False Claims Act and interpreted by the courts.

313. By virtue of the false records or statements Defendants made, used or caused to be made or used, the State of New York has suffered actual damages in an amount to be proven at trial. The State of New York is entitled to recover treble damages plus a civil monetary penalty for each and every false claim.

**COUNT VII: REVERSE FALSE CLAIMS**
(against all Defendants)
NY State Finance Law, Art. XIII § 189(1)(g)

314.   The Relators repeat and re-allege each allegation in each of the preceding paragraphs as if fully set forth herein.

315.   During the period 2014 to the present day, Defendants made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the State of New York.

316.   Such false records or statements or knowing concealment, avoidance or decrease of an obligation to pay or transmit money to the United States were made or done knowingly, as defined in State Finance Law, Art. XIII § 188(3).  Failure to return any overpayment such as the claims on which Defendants received any overpayment from the New York Medicaid program constitutes a reverse false claim under Art. XIII § 189(1)(g) of the New York False Claims Act.

317.   By virtue of Defendants' conduct, the State of New York has suffered actual damages in an amount to be proven at trial.  The State of New York is entitled to recover treble damages plus a civil monetary penalty for each and every false claim.

**COUNT VIII: RETALIATION AND CONSTRUCTIVE DISCHARGE V.
THE GRAND REHABILITATION AND NURSING AT PAWLING**
NY State Finance Law, Art. XIII § 191

318.   The Relators repeat and re-allege each allegation in each of the preceding paragraphs as if fully set forth herein.

319.   During the period of April 2017 to April 2018, Relator Stacey Rosenberger engaged in lawful acts and protected activity in furtherance of her efforts to stop more than one violations of the New York False Claims Act.  On or about April 19, 2018, she was

constructively terminated because she refused to participate in the fraudulent and illegal practices described herein.

320.    As a direct and proximate result of this unlawful termination by Defendant The Grand Rehabilitation And Nursing At Pawling, Relator Rosenberger has suffered economic damages in an amount to be asserted at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Relators demand and pray that judgment be entered in favor of the United States, the State of New York, and the Relators as follows:

1.    On Counts I, II, and III enter judgment holding the Defendants jointly and severally liable for the maximum civil penalties permitted for each violation of the federal False Claims Act committed by the Defendants;

2.    On Counts I, II, and III enter a judgment against the Defendants jointly and severally for three times the amount of damages sustained by the United States of America because of the acts of the Defendants;

3.    On Counts V, VI, and VII enter judgment holding the Defendants jointly and severally liable for the maximum civil penalties permitted for each violation of the New York False Claims act as pled herein;

4.    On Counts V, VI, and VII enter judgment against the Defendants jointly and severally for the damages sustained by the State of New York because of the acts of the Defendants described herein, multiplied, as permitted under the New York False Claims Act;

5.    Award the Relators a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730;

6.    Award the Relators a percentage of the proceeds of recoveries under the New York False Claims Act;

7.    Award the Relators their costs and reasonable attorneys' fees and costs for prosecuting this action;

8.    On Count IV, award Relator Rosenberger compensation for double lost back pay, with interest; front pay in lieu of reinstatement; compensation for special damages, including litigation costs and attorney's fees as allowed by the FCA; and any other damages allowed by law;

9.    On Count VIII, award Relator Rosenberger compensation for double lost back pay, with interest; front pay in lieu of reinstatement; compensation for special damages, including litigation costs and attorney's fees as allowed by the New York FCA; and any other damages allowed by law; and

10.    All other relief as may be required or authorized by law in the interest of justice.

## DEMAND FOR JURY TRIAL

Relators, on behalf of themselves, the United States, and the State of New York, demand a jury trial on all claims alleged herein.

Dated: October 24, 2019

Relators Stacey Rosenberger
and Kelley Retig by their attorneys,

Jeffrey A. Newman, Esq.
Massachusetts BBO # 370450
Jeffrey Newman Law
One Story Terrace
Marblehead, Ma. 01945
Tel: 617-823-3217
Fax: 781-639-8688
Jeffrey@jeffreynewmanlaw.com

WILLENS & SCARVALONE LLP

Jonathan A. Willens
NDNY Bar No. 103405
Edward Scarvalone
One Liberty Plaza, Suite 2300
New York, NY 10006
Tel: (646) 200-6333
Fax: (800) 879-7938
jawillens@willensscarvalone.com